CHURCH OF SCIENTOLOGY OF GEORGIA, INC., Plaintiff,

v.

CITY OF SANDY SPRINGS, GEORGIA, a Municipal Corporation of the State of Georgia; City Council of the City of Sandy Springs, Georgia; Eva Galambos, in her Official Capacity as Mayor of the City of Sandy Springs, Georgia; John Paulson, Dianne Fries, William Coppedge Collins, Jr., Ashley Jenkins, Tiberio DeJulio and Karen Meinzen McEnerny, individually and in their official capacities as Members of the City Council of the City of Sandy Springs, Georgia, Defendants.

No. 1:10–CV–00082–AT.

United States District Court, N.D. Georgia, Atlanta Division.

Feb. 10, 2012.

Andrea Cantrell Jones, George Douglas Dillard, and Lauren MacLeod Hansford, Dillard & Galloway, for Plaintiffs.

Laurel E. Henderson and William Charles Hayes, Henderson & Hundley, P.C.; Wendell K. Willard, Law Office of Wendell K. Willard, for Defendant.

*AMENDED ORDER*

AMY TOTENBERG, District Judge.

I. Background ....................................................................1336
 A. Church of Scientology ..................................................1337
 B. Subject Property and CSI's Space Requirements ..........................1339
 C. Rezoning Application ...................................................1341
 D. Zoning Requirements ....................................................1341
 E. Planning Staff & Commission Recommendations ...........................1342
 1. Parking Studies ....................................................1343
 2. Alternate Conditions ...............................................1344
 F. City Council Decision ..................................................1345
 G. Plaintiff's Complaint ..................................................1345
 H. Parties' Contentions ...................................................1345

II. Summary Judgment Standard .....................................................1346

III. Ripeness ......................................................................1347

IV. Analysis .......................................................................1349
 A. RLUIPA.................................................................1349
 1. Section (a) Substantial Burden Provision ...........................1350
 a. Whether the City Made an Individualized Assessment ..............1350
 b. Whether the City's Decision Imposed a Substantial Burden on the Church's Religious Exercise ...............................1352
 2. Section (b): Equal Terms, Nondiscrimination, Exclusions and Limits....1359
 a. RLUIPA's Equal Terms Provision ................................1359
 b. RLUIPA's Nondiscrimination Provision ..........................1360
 i. Whether Plaintiff Identified Similarly Situated Comparators .....................................1362
 ii. Whether the City Acted With a Discriminatory Purpose .......1370
 c. RLUIPA's Exclusions and Limits Provision ......................1377
 B. Freedom of Speech ....................................................1377
 C. Federal Takings and State Inverse Condemnation Claims .................1378
 D. Violation of Substantive Due Process Under Georgia Constitution .........1379
 E. Mandamus .............................................................1380

V. Conclusion .....................................................................1380

This case arises from a zoning dispute over the Church of Scientology's desire to convert a 32,053 square foot office building into a roughly 44,000 square foot Church, referred to by Scientologists as an "Ideal Organization." The City of Sandy Springs approved the use of the subject property for a church but limited the size of the building to the existing 32,053 square feet based on a lack of sufficient on-site parking. The Church of Scientology filed this suit pursuant to the Religious Land Use and Institutionalized Persons Act ("RLUI-PA"), which prohibits governments from implementing land use regulations that impose a "substantial burden" on religious exercise or that discriminate against any religious assemblies or institutions on the basis of religious denomination. 42 U.S.C. § 2000cc(a) & (b)(2). However, as Plaintiff's counsel recognized before the City Council, "[t]he issue in this case has not been one of land use. It has been one of parking and a perceived issue as it relates to traffic." (Tr. Dec. 15, 2009, City Council Hearing 4:18–20, Doc. 47–1.)

■ On September 30, 2011, the Court issued an Order on the parties' cross-motions for summary judgment. (Doc. 86.) The Court raised the question of whether Plaintiff's claims were ripe and directed the parties to submit additional briefing on the ripeness issue. This issue has now been fully briefed. (Docs. 87, 88.) Additionally, the parties have fully briefed the issues raised in Plaintiff's October 28, 2011, Motion for Reconsideration of the September 30, 2011, Order granting summary judgment in favor of Defendant on Plaintiff's claim for discrimination under RLUIPA. (Docs. 89, 90.) Having reviewed the parties' briefs on ripeness and the motion for reconsideration as well as the additional evidence submitted by Plaintiff regarding its original request for a parking variance,[1] the Court hereby **GRANTS** Plaintiff's Motion for Reconsideration, [Doc. 89], inasmuch as a question of fact exists as to whether the City discriminated against Plaintiff on the basis of its religious denomination in granting Plaintiff conditional approval of its rezoning application.[2]

Accordingly, the Court **VACATES** its Order issued on September 30, 2011, and **ENTERS** the following Order.

## I. BACKGROUND

Keeping in mind that when deciding a motion for summary judgment, the Court must view the evidence and all factual

---

1. Neither party submitted evidence of Plaintiff having originally requested a variance from the City's parking requirement in their respective cross motions for summary judgment. However, Plaintiff presented such evidence, (Doc. 88–1), after the Court questioned whether Plaintiff's claims were ripe because it had failed to apply for a variance under the Supreme Court's ripeness analysis in *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). Plaintiff additionally then presented evidence of an email from a City of Sandy Springs planner indicating that the parking variance was not needed as sufficient parking spaces existed on-site. (Doc. 88–3.) Defendants did not challenge the authenticity of the Plaintiff's evidentiary submission regarding this variance request.

2. A court should grant a motion for reconsideration only if: (1) there has been an intervening change in controlling law; (2) the moving party discovers new evidence; or (3) reconsideration is needed to correct clear error or prevent manifest injustice. *See* LR 7.2(E), NDGa.; *Bryan v. Murphy*, 246 F.Supp.2d 1256, 1258 (N.D.Ga.2003). Motions for reconsideration should not be used to present the court with new arguments or evidence that should have been raised earlier, arguments already heard and dismissed, or to repackage familiar arguments to test whether the court will change its mind. *Id. (citing Brogdon ex rel. Cline v. Nat'l Healthcare Corp.*, 103 F.Supp.2d 1322, 1338 (N.D.Ga.2000); *Johnson v. United States*, No. Civ. A. 1:96–CV–1757–JOF, 1999 WL 691871 (N.D.Ga. July 14, 1999) (Forrester, J.)). Plaintiff raises new arguments in support of its discrimination claim in the motion for reconsideration and now relies on evidence available in the record on summary judgment that it failed to properly identify for the Court under Local Rule 56.1 requiring the moving party to direct the court's attention to each portion of the record which supports the party's claims. Nonetheless, the Court finds that reconsideration of its prior ruling on Count II of Plaintiff's Complaint is appropriate to prevent the potential manifest injustice of dismissing Plaintiff's nondiscrimination claim in light of the existence of triable issues of fact as to whether the City acted with discriminatory intent, despite the fact that this evidence could clearly have been presented in the original summary judgment briefing and materials. Based on the entirety of the evidence in the record as more clearly demonstrated by Plaintiff in its motion for reconsideration, in conjunction with new, unchallenged evidence provided in the briefing on ripeness that Plaintiff originally sought a parking variance but was informed by a member of the City's planning staff that no variance was needed because the Church met the City's minimum parking requirement, the Court finds that Plaintiff has now sufficiently demonstrated evidence from which a possible inference of discrimination could be made.

inferences in the light most favorable to the party opposing the motion, the Court provides the following statement of facts. *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241 (11th Cir.2007) (observing that, in connection with summary judgment, court must review all facts and inferences in light most favorable to non-moving party). This statement does not represent actual findings of fact. *In re Celotex Corp.*, 487 F.3d 1320, 1328 (11th Cir.2007). Instead, the Court has provided the statement simply to place the Court's legal analysis in the context of this particular case or controversy.

## A. Church of Scientology

Plaintiff, the Church of Scientology of Georgia, is a religious organization that currently operates a church at 4588 Winters Chapel Road, in Doraville, Georgia ("the Winters Chapel Location"). (Pl.'s Statement of Material Facts ¶¶ 1, 4, Doc. 37–4, (hereinafter "PSMF"); Defs.' Response to Pl.'s Statement of Material Facts ¶¶ 1, 4, Doc. 60, (hereinafter "Defs.' Resp. SMF"); Cartwright Aff. ¶¶ 3, 4, Doc. 38–1, Ex. A; Danos Aff. ¶ 4, Doc. 38–1, Ex. B.) When the Complaint in this matter was filed, the Church operated in leased space at 4480 North Shallowford Road, Dunwoody, Georgia ("the Dunwoody Location"). (PSMF ¶ 3; Defs.' Resp. SMF ¶ 3; Danos Aff. ¶ 3.)

Scientology is an applied religion based upon the research, writings and recorded lectures of L. Ron Hubbard, which collectively constitute the Scriptures of the religion. (PSMF ¶ 8; Defs.' Resp. SMF ¶ 8; Cartwright Aff. ¶¶ 6–8.) The Scriptures are the source of the beliefs, practices, rituals, and policies of the religion. (*Id.*) The Church serves a state-wide congregation of 600 members, 100 of whom are currently active. It has a staff of 20 volunteer and paid employees. (Defs.' Statement of Material Facts ¶ 2, Doc. 43–2, (hereinafter "DSMF"); Pl.'s Response to Defs.' Statement of Material Facts ¶ 2, Doc. 67, (hereinafter "Pl.'s Resp. DSMF"); Compl. ¶ 17.) Plaintiff is the only church of Scientology in the state. (DSMF ¶ 6; Pl.'s Resp. DSMF ¶ 2; Danos Dep. 40:10–20.) Scientology facilities are classified in one of four ways: (1) groups, (2) missions, (3) Class V Organizations, or (4) advanced organizations. (DSMF ¶ 3; Pl.'s Resp. DSMF ¶ 3; Wright Dep. 10:19–11:10.) Plaintiff is a Class V Organization. (DSMF ¶ 7; Pl.'s Resp. DSMF ¶ 7; Wright Dep. 11:21–24.)

The Church of Scientology International (hereinafter "CSI") is the senior ecclesiastical management church in the Scientology religion. (DSMF ¶ 7; Pl.'s Resp. DSMF ¶ 7; Compl. ¶ 34; Wright Aff. ¶ 3; Cartwright Aff. ¶¶ 35–38.) CSI mandates that all new Class V Organizations conform to the template of an "Ideal Central Organization" more commonly known as an "Ideal Org." (DSMF ¶ 9; Pl.'s Resp. DSMF ¶ 9; Danos Dep. 50:11–51:24; Wright Aff. ¶ 3; Cartwright Aff. ¶¶ 35–38.) CSI expects that Plaintiff, as part of its function as an Ideal Org, will open up new missions and new groups that will eventually grow to become new Class V Churches. (Wright Aff. ¶ 10.)

The concept of the Ideal Org originated in Hubbard's writings on Scientology, but the actual implementation of the concept of the Ideal Org was developed more recently from approximately 2003 to 2007 when CSI undertook a study of Hubbard's writings to determine the necessary physical requirements for a Church to ensure that religious services are orthodox and uniform, which is a fundamental requirement of Scientology religious doctrine. (PSMF ¶ 33; Defs. Resp. PSMF ¶ 33; Cartwright Aff. ¶¶ 38–43; Wright Aff. ¶ 4; Wright Dep. 43:16–45:21.) According to the December 12, 2010, Affidavit of Robert Wright,

[B]eginning in 2003, CSI embarked on a program to create [Ideal Orgs].... An Ideal Class V Organization holds and houses all of the functions required for a Class V Church, according to the Scientology Scriptures, and is able to actually deliver all of those functions and services. Even many today, an estimated 90% or more)[sic] of our existing Church buildings are not of the correct size to house all the functions. For that reason, for the last five (5) or six (6) years, Scientology churches around the world have been purchasing new buildings so that they can provide all the needed programs and functions of the church. (Wright Aff. ¶ 4.) Plaintiff contends that CSI determined that a minimum of 40,000 square feet is required to provide all the necessary religious services, although ideally a "range of 50,000 to 65,000 square feet is easier" in terms of space planning. (PSMF ¶ 34; Wright Aff. ¶ 9.)[3] However, Mr. Wright testified that there is no written document specifying the amount of square feet required. (Wright Dep. 46:19–47:3.)

Scientology's core religious services are "Training" and "Auditing." (PSMF ¶ 17; Defs.' Resp. SMF ¶ 17; Cartwright Aff. ¶ 18.) Through Scientology Training "one obtains the wisdom to understand who he is, what he is, where he comes from and his relationship to the Universe." (PSMF ¶ 20; Defs.' Resp. SMF ¶ 20; Cartwright Aff. ¶ 19.) One half of the spiritual gains in Scientology come from Training. (*Id.*) Scientology Auditing is a form of religious counseling ministered at Scientology churches in confidential one-on-one sessions between a specially trained individual called an "Auditor" and a parishioner. (PSMF ¶ 24; Defs.' Resp. SMF ¶ 24; Cartwright Aff. ¶¶ 22, 23.)

Training is provided through Scientology religious courses at Scientology churches. (PSMF ¶ 19; Defs.' Resp. SMF ¶ 19; Cartwright Aff. ¶ 19.) Most training courses are divided into Theory and Practical sections. (PSMF ¶ 21; Defs.' Resp. SMF ¶ 21; Cartwright Aff. ¶ 20.) The Theory course rooms are arranged differently from the Practical course rooms and are configured to use a variety of equipment. (*Id.*) Certain course rooms are designed to be located adjacent to other related course rooms. (PSMF ¶ 22; Defs.' Resp. SMF ¶ 22; Wright Aff. ¶ 17.) Many course rooms relate to one another such that as many as five (5) course rooms may be utilized by the students of one class, who migrate from room to room at their own pace during a study period. (PSMF ¶ 23; Defs.' Resp. SMF ¶ 23; Cartwright Aff. ¶ 21.)

Auditing must be provided in quiet and confidential surroundings, away from other activities that may be going on in a church. (PSMF ¶ 25; Defs.' Resp. SMF ¶ 25; Cartwright Aff. ¶ 24.) Each Scientology church has numerous small Auditing rooms where Auditing sessions take place. (Cartwright Aff. ¶ 23.) With the exception of certain advanced Scientology churches, each local Scientology church must have sufficient facilities to provide the full range of Training and Auditing religious practices necessary to follow the prescribed path of spiritual healing and enlightenment known as "The Bridge to Total Freedom." (PSMF ¶¶ 15, 18; Defs.' Resp. SMF ¶¶ 15, 18; Cartwright Aff. ¶¶ 16, 17; Wright Aff. ¶ 6.)[4]

---

**3.** Defendant contends that there is no requirement that an Ideal Org be completely housed in a single facility based on Mr. Wright's deposition testimony that the Seattle facility consists of two separate buildings that together make up the 43,000 to 44,000 square feet and are located a five minute drive apart. (Wright Dep. 123:1–14.)

**4.** An Ideal Org must also include space for a sauna and exercise program (referred to as the "purification rundown center"), a public

Scientology churches also hold congregational services on Sundays, religious holidays, and certain other occasions. (PSMF ¶ 28; Defs.' Resp. SMF ¶ 28; Cartwright Aff. ¶ 27; Wright Aff. ¶ 21.) Scientologists believe that the expansion and dissemination of the religion is necessary to salvage human civilization. (PSMF ¶ 29; Defs.' Resp. SMF ¶ 29; Cartwright Aff. ¶ 32.) All Scientology churches have a religious obligation to reach out to their community to spread the word of Scientology to new members and are therefore mandated to include large public display areas. (PSMF ¶¶ 30, 31; Defs.' Resp. SMF ¶¶ 30, 31; Cartwright Aff. ¶¶ 33, 34.)

## B. Subject Property and CSI's Space Requirements

The Church purchased property at 5395 Roswell Road, Sandy Springs, Georgia ("the property" or "the subject property") in 2005 to enable it to provide a full range of Scientology religious services and to allow for future growth, which it was unable to accommodate at the Dunwoody location or at its current Winters Chapel Road location. (PSMF ¶¶ 5, 6; Defs.' Resp. SMF ¶¶ 5, 6; Danos Aff. ¶¶ 5, 6.) The physical space needs of the Church are dictated by the nature of Scientology and its religious beliefs and practices. (PSMF ¶ 7; Defs.' Resp. SMF ¶ 7; Wright Aff. ¶ 8.) While CSI had established some guidelines on the types of services to be provided in a Class V Ideal Org as of 2005 when Plaintiff purchased the property at issue, CSI had yet to complete its study of the minimum space requirements necessary to house those services. (DSMF ¶ 10; Pl.'s Resp. DSMF ¶ 10; Wright Dep. 44–46.) Plaintiff contends that although the study was not complete as of 2005, the size of the building on the property was an important factor in CSI's approval of the property for purchase by Plaintiff. (Pl.'s Resp. DSMF ¶ 10; Wright Aff. ¶ 24.) In accordance with the procedures that CSI has promulgated, Plaintiff submitted a Building Investment Committee Checklist ("Checklist") to CSI for approval prior to its purchase of the property. (PSMF ¶ 37; Defs.' Resp. SMF ¶ 37; Wright Aff. ¶ 24.) [5] Plaintiff asserts that prior to purchasing the property the Church "confirmed that a

---

bookstore, and a café. (*See* Danos Dep. 67:5–24; 74:19–75:2; 79:9–80:4.)

**5.** The Checklist addresses CSI's potential concerns regarding whether the subject property will provide an adequate facility for an Ideal Org. With regard to whether "there are any obvious [renovations] needed," the Checklist states "possibly taking the underground parking and creating more delivery space so that the entire 43,000 sf are useable." (Ex. I to Pl.'s Resp. SMF, Doc. 67–1 at 7.) With regard to "how many parking spaces are available at the building," the Checklist states "25 underground enclosed spaces, 86 surface spaces. An existing easement with the next door neighbor … makes available another 120 parking spaces," and notes the Church's belief that this parking arrangement satisfied the City's parking requirements. *Id.* at 8, 13. Although the Checklist found the gross square footage of the building to be sufficient, "due to the lack of foot traffic in this area, an additional testing center would have to be located." *Id.* at 10. The Checklist also lists numerous "pluspoints" and "outpoints" with the "outpoints" appearing to be negative factors weighing against the purchase of the subject property. The Checklist discusses on-site parking as an "outpoint" as follows: "An easement exists with the neighbor next door for parking (building has 86 spots, USPS next door has hundreds more) but it is not final. There is no reason to think that it could not be finalized, but it is not at this time." *Id.* at 11. Additionally, with regard to whether the use for a church "is clearly allowed per the zoning regulations," the Checklist states "[a]lthough Church use is typically permitted in Office & Industrial, I discovered that this building has restrictions to allow only office use. This would require a variance in order to have a Church. The handling would be to have the seller get the rezoning done before purchase of the building was finalized." (Doc. 67–2 at 3.)

church was a permitted use in the property's O–I zoning designation and that the number of existing surface parking spaces would satisfy the applicable parking regulations." (PSMF ¶ 45.) The City denies that the Church requested a parking space confirmation prior to its purchase of the subject property or in turn, that the City provided a pre-purchase confirmation that the number of surface parking spaces on the property was sufficient to satisfy the requirements of the Parking Ordinance. (DSMF ¶ 45.) The Certificate of Zoning provided by the City to the Church on June 6, 2005,[6] states only that the subject property is currently zoned in the O–I (Office & Institutional District) and does not address parking. (Danos Dep., Ex. 5.)

The total square footage of the existing office building is roughly 43,000 square feet,[7] including an approximate 12,000 square foot basement that was previously used, in part, as a parking garage.[8] (PSMF ¶¶ 41–42; Defs.' Resp. SMF ¶ 41; DSMF ¶ 12; Pl.'s Resp. SMF ¶ 12; Compl. ¶ 38; Leathers Dep. Ex. 20 at 1.) While the exact configuration is unclear from the record, the property was served by 111 parking spaces comprised of surface spaces, garage spaces, and spaces provided by an easement on the neighboring post office property. (PSMF ¶ 50, Ex. E, Kimley–Horn Parking Study, June 2009 Doc. 39–1; DSMF ¶ 13; Leathers Dep. Ex. 20 at 21.)[9] In order to accommodate its growing needs and to provide an adequate facility in which to exercise its religious precepts, the Church developed plans to redesign the existing building on the property and to convert the 11,193 square foot

6. Plaintiff's alleged request for confirmation of the required parking for the site in 2005 is not to be confused with the later email correspondence by the City planner that the Church's site plan complied with the City's minimum parking requirement in 2009 in connection with Plaintiff's variance request in its initial rezoning application.

7. According to the parties' briefing, the total square footage of the building is 43,196. However, Reports prepared by the City during the zoning process state that the building is 43,246 square feet comprised of 32,053 square feet of office space and 11,193 square feet of basement. Plaintiff's Parking Study makes a similar finding. (See Doc. 39–1; 42–2.)

8. There is some dispute regarding the layout of the existing building. (See PSMF ¶¶ 41–42; Defs.' Resp. SMF ¶¶ 41–42.) The City disagrees with Plaintiff's characterization of the entire 43,000 square feet being improved office space. (See Defs.' Resp. SMF ¶ 41.) According to the City, the building contains 32,053 square feet of improved office space in three finished stories and an 11,193 square foot basement parking garage. (See Defs.' Resp. SMF ¶ 41; see also Compl. ¶¶ 37, 38; Leathers Decl. ¶ 5.) The City also disagrees with any implication that the existing basement is not part of the property's on-site parking. Plaintiff disagrees with the characterization of the basement as a garage used for parking. (See PSMF ¶¶ 41–42.) It is clear that the basement garage was considered both by the Church and the City as part of the property's on-site parking during the rezoning process. (See Checklist, Ex. I to Pl.'s Resp. SMF, Doc. 67–2 at 15 ("The basement is approximately 11,916 square feet. It has been used as underground parking. It could be made usable service space with renovations."); Leathers Dep., Ex. 20 at 1, 9, Doc. 42–2 at 12, 22.) Therefore, any disputes between the parties as to the extent of the use of the basement as garage parking is not material to the Court's resolution of the parties' motions.

9. Defendants' briefing contends the parking spaces are broken out as follows: 51 surface spaces, 30 easement spaces, and 30 garage spaces. According to the Reports prepared by the City the surface lot has 50 spaces, the basement garage has 30 spaces, and the easement provides 31 spaces. (Leathers Dep., Ex. 20, p. 8, Leathers Dep. Ex. 24, p. 8.) It is undisputed that the existing basement provided 30 garage spaces. (Leathers Dep., Ex. 20 at 8, Leathers Dep. Ex. 24, at 8; June 2009 Kimley–Horn Parking Study at 1, Doc. 39–1 at 5.)

basement to religious uses, including a chapel, in the area formerly used for parking. (PSMF ¶ 43; Defs.' Resp. SMF ¶ 43; Danos Aff. ¶ 9; Compl. ¶ 42.)

## C. Rezoning Application

A church is a permitted use in the O–I (Office and Institutional District) zoning classification under the Sandy Springs Zoning Ordinance ("Zoning Ordinance"). (PSMF ¶ 46; Defs.' Resp. SMF ¶ 46; Danos Aff. ¶ 12; Compl. ¶ 41.) However, prior to Plaintiff's purchase, the property's O–I zoning was conditioned on its use as office space, thus preventing its use as a church without a rezoning to remove this condition. (PSMF ¶ 46; Defs.' Resp. SMF ¶ 46; DSMF ¶ 22; Danos Aff. ¶ 12; Leathers Aff. ¶ 4; Compl. ¶ 41.) In March 2009, the Church submitted an application to the City of Sandy Springs ("the City") for a rezoning to permit the use of the property as a church (hereinafter "the Application"). (PSMF ¶ 47; Defs.' Resp. SMF ¶ 47; DSMF ¶ 23; Danos Aff. ¶ 13; Leathers Aff. ¶ 4; Compl. ¶ 43.) Plaintiff's Application also requested several concurrent variances, including acceptance of the existing quantity of parking spaces.[10] (Doc. 88–1.) The Application sought approval of the expansion of the building from 32,053 square feet to 43,916 square feet by conversion of the 11,193 square foot basement/garage area to religious uses. (PSMF ¶ 47; Defs.' Resp. SMF ¶ 47; DSMF ¶ 24; Danos Aff. ¶ 13; Leathers Aff. ¶ 5; Compl. ¶ 43.) As a result of the needed expansion, the Church's Application proposed eliminating 30 parking spaces in the basement garage, thereby decreasing the amount of available parking from 111 existing spaces to 81 spaces.

(Leathers Dep., Ex. 20 at 8; Leathers Dep. Ex. 21 at 8; PSMF Ex. E, Kimley–Horn Parking Study, June 2009, Doc. 39–1; PSMF ¶ 47; DSMF ¶ 25.) On March 24, 2009, a City planner informed the Church via e-mail that it did not need a parking variance because "[t]he required parking count is 47 and according to the site plan you have 64." (Doc. 88–3.) Thereafter, on May 5, 2009, Plaintiff amended its Zoning Application, in part, to remove its request for a parking variance. (Doc. 88–4.)

## D. Zoning Requirements

The Zoning Ordinance defines "Church, Temple or Place of Worship" as "[a] facility in which persons regularly assemble for religious ceremonies. This shall include, on the same lot, accessory structures and uses such as minister's and caretaker's residences, and other uses identified under the provisions for Administrative and Use Permits." (Zoning Ordinance § 3.3.3, Doc. 49–1 at 15 (R000560); DSMF ¶ 32; Pl.'s Resp. SMF ¶ 32.) Section 18.2.1 of the Zoning Ordinance (hereinafter "the Parking Ordinance") contains a schedule of parking requirements based on industry standards and broken down by use. (DSMF ¶ 29; Pl.'s Resp. SMF ¶ 29; Leather's Decl. ¶ 6; Zoning Ordinance § 18.2.1, Doc. 51–1 at 1–6.) The Parking Ordinance provides that "[p]arking requirements shall be calculated based on the proportion that each use contributes to the total." (Zoning Ordinance § 18.2.1, Doc. 51–1 at 1.) According to the City, based on the use of a property, the staff applies these standards to determine how much parking is required on the site, assuming operation at full capacity. (DSMF ¶ 30; Leather's Decl. ¶ 6.)[11] For

10. In addition, Plaintiff requested and received approval for variances (1) to allow the existing parking within the required minimum front yard set back and side corner; (2) to allow the existing sign to encroach into the right-of-way; and (3) to reduce the twenty

(20) foot side setback to five (5) feet to allow the existing building to remain. (Leathers Dep. Ex. 20 at 1.)

11. The Court notes that Plaintiff disputes these facts on the basis that the language of

"Churches and Other Places of Worship," parking is generally calculated on the total number of fixed seats or the total square footage of the largest assembly area. (DSMF ¶ 31; Pl.'s Resp. SMF ¶ 31; Leather's Decl. ¶ 7.) Specifically, the Parking Ordinance requires 1 parking space per 3.5 fixed seats in the largest assembly area or 1 parking space per 30 square feet in the largest assembly area. (Zoning Ordinance § 18.2.1, Doc. 51–1 at 1–6.) The Parking Ordinance requires 3 spaces per 1,000 square feet of office space and 5 spaces per 1,000 square feet of classroom space. (Zoning Ordinance § 18.2.1, Doc. 51–1 at 1–6; Leathers Dep., Ex. 20 at 9.)

### E. Planning Staff & Commission Recommendations

Despite a City planner previously advising Plaintiff on March 24, 2009, that there was sufficient parking on the subject property, the City's Planning Staff (hereinafter "the staff") determined that the on-site parking was deficient in its initial Staff Report prepared for the Planning Commission Hearing on May 21, 2009 (hereinafter "May 21, 2009, Staff Report").[12] (Doc. 88–5.) Specifically, the May 21, 2009, Staff Report determined the required parking for the property as follows:

Article 18.2.1 indicates parking requirements are to be calculated based upon the proportion that each use contributes to the total. For example, a building with multiple uses would be required to

provide parking based upon the total parking requirement associated with each use. On the other hand, parking requirements for uses with large public assembly areas relative to the remainder of the building (i.e. meeting halls or libraries) are based upon the largest public assembly area. Normally, staff would analyze the parking needs for the Church of Scientology building relative to the size of the sanctuary. However, because proposed development will have a sanctuary which comprises less than 5% of the total net floor area, staff has instead analyzed the parking impact using an aggregate of the uses in the building (sanctuary, offices and classrooms).

(*Id.* at 8; *see also* Leathers Dep., Ex. 20 at 8; Leathers Dep. Ex. 21 at 8; PSMF ¶ 51; Defs.' Resp. SMF ¶ 51.) Using the City's typical parking calculation for "Churches or Other Places of Worship," Plaintiff's property would be required to provide 41 parking spaces. (PSMF ¶ 49; Kimley–Horn Parking Study, Doc. 39–1.)

Based on information provided by Plaintiff during the rezoning process regarding the nature of its religious practices, the City determined that the Church of Scientology is different from "traditional" churches or places of worship as defined by the Zoning Ordinance in that Scientology focuses on individualized study and course work rather than large congrega-

the Parking Ordinance does not incorporate or assume operation at full capacity. (Pl.'s Resp. SMF ¶ 30.) Plaintiff further contends, without citation to any evidence in the record, that "it has not been the City's policy to determine parking requirements based on full capacity of a church." (*Id.*)

12. The Court has scoured the record and determined that neither party submitted the May 21, 2009, Staff Report as an exhibit on summary judgment. Plaintiff submitted the May 21, 2009, Staff Report for the first time

as an exhibit in support of its October 28, 2011, Motion for Reconsideration. However, the Staff Report prepared for the June 16, 2009, Mayor and City Council Meeting (Leathers Dep., Ex. 20) and the Staff Report prepared for the July 16, 2009, Planning Commission Meeting (Leathers Dep., Ex. 21)—relied on by the Court in its September 30, 2011, Order on summary judgment—also found the on-site parking deficient for the same reasons stated in the May 21, 2009, Staff Report.

tional gatherings in the sanctuary. (DSMF ¶ 33; Leather's Decl. ¶ 8; Leathers Dep., Ex. 20 at 12.) During the November 19, 2009, Planning Commission meeting, counsel for Plaintiff stated "they have a chapel service that occurs on the weekend. And that is where they come together for chapel. It is not like a congregational style church like you may be accustomed to that everybody turns out at the same time every week for one particular hour or a series of several hours. They don't typically do that .... the general use of the building will be the offices, for counseling and classroom study." (Tr. Nov. 19, 2009, Planning Commission Meeting, Doc. 46–1 at 33:16–22.) The City found that a lack of adequate parking on the property "could cause an excessive or burdensome use of the existing infrastructure." (Leathers Dep., Ex. 20 at 12.) As a result, the staff initially calculated the parking requirement under Section 18.2.1 based on a breakdown by square footage of the facility's various proposed uses (office, classroom, sanctuary) by totaling the required parking for each type of use. (DSMF ¶ 36; PSMF ¶ 52; Defs.' Resp. SMF ¶ 52; Leathers Dep., Ex. 20 at 9.) The staff determined that Plaintiff's proposed use of the property required 148 parking spaces broken out as follows: (1) Chapel (1,218 SF)—41 spaces; (2) Classrooms (11,153 SF)—56 spaces; (3) Offices (17,065 SF)—51 spaces. (DSMF ¶ 37; Compl. ¶ 49; Leathers Dep., Ex. 20 at 9.)

Accordingly, the staff made the following recommendations to the Planning Commission:

> The proposed use (a place of worship) incorporates a build-out of the existing lower level parking deck to create a new sanctuary, additional office space and classrooms. An analysis was prepared by staff comparing the proposed uses within the building and minimum parking standards from Article 18.2.1 of the Zoning Ordinance associated with each use. According to this analysis (see Table 1), the site at full build-out would not provide the minimum number of parking spaces required per code. Because of this, staff recommends the total building area be limited to 32,053 square feet unless the applicant receives a variance from the minimum parking requirements or can demonstrate a reduction is warranted due to the operation of use such that parking spaces could be shared.... It is the opinion of the staff that the proposed use and density are consistent with the Future Land use Map and the policies of the Comprehensive Plan. The entire 43,246 square feet could be recommended for approval by staff if the applicant can demonstrate that the on-site parking will be sufficient to meet the full use of the proposed building including the expansion through either a parking study or shared-parking analysis. Therefore, based on these reasons, the staff recommends *AP-PROVAL CONDITIONAL* of the request to rezone the subject property from O–I (Office and Institutional District) to O–I (Office and Institutional District) conditional and the associated concurrent variance.

(Doc. 88–5 at 13; *see also* Leathers Dep., Ex. 20 at 13; Leathers Dep. Ex. 21 at 12; PSMF ¶ 55; Defs.' Resp. SMF ¶ 55.) The City deferred consideration of the Church's Application to allow the Church time to provide staff with a parking study to demonstrate the parking needs for the property. (PSMF ¶ 56; Defs.' Resp. SMF ¶ 56; DSMF ¶ 40; Pl.'s Resp. SMF ¶ 40.)

### 1. Parking Studies

Plaintiff submitted a parking study of its Nashville, Tennessee and Dunwoody, Georgia facilities conducted by Kimley–Horn in June 2009, and supplemented the study in July 2009, with an analysis of a third facility in Buffalo, New York ("the

Parking Studies"). (DSMF ¶ 41; Pl.'s Resp. SMF ¶ 41; PSMF ¶ 71; Defs.' Resp. SMF ¶ 71; Leather's Decl. ¶ 12; Compl. ¶ 52; Kimley–Horn Parking Study, Docs. 39–1, 39–2.) The Parking Studies determined that the maximum number of parking spaces needed for Plaintiff's proposed use of the property, based on peak demand per square foot of the Nashville facility, would be 52 parking spaces. (PSMF ¶¶ 58–63; Defs.' Resp. SMF ¶¶ 58–63; Kimley–Horn Parking Study, Docs. 39–1, 39–2.)[13] Upon review of the Parking Studies, the staff subsequently revised its parking recommendation and calculated an alternate parking ratio, based on the information provided regarding the Nashville facility, to reduce the required parking from 148 spaces to 130 spaces. (DSMF ¶ 42; Pl.'s Resp. SMF ¶ 42; PSMF ¶¶ 66–67; Defs.' Resp. ¶¶ 66–67; Leather's Decl. ¶¶ 12–14; Leathers Dep., Ex. 21 at 8; Leathers Dep., Ex. 22 at 8–9.) Nonetheless, the staff found that the available parking was still deficient to support Plaintiff's proposed expansion at full capacity and once again recommended "restricting the use of the subject property to the existing 32,053 square foot building with the existing 111 spaces."[14] (Leathers Dep., Ex. 22 at 8–9, 14.) The Church's Application was again deferred. (Leathers Dep., Ex. 23 at 2.)

### 2. Alternate Conditions

On September 1, 2009, representatives of the Church met with the staff and the City Attorney to discuss alternate conditions for approval of the Church's Application requesting conversion of the basement to religious uses. (PSMF ¶ 77; Defs.' Resp. ¶ 77; Leathers Decl. ¶ 15.) The Church submitted a set of alternate conditions to its Application proposing a limitation on the occupancy of the building to 283 people, based on the 81 parking spaces provided after conversion of the basement, and applying a parking ratio of 3.5 people per vehicle ("the First Alternate Conditions"). (PSMF ¶ 77; Defs.' Resp. ¶ 77; Leathers Decl. ¶ 15; Leathers Dep., Ex. 23 at 19.) The staff recommended approval of the First Alternate Conditions. (PSMF ¶ 78; Defs.' Resp. ¶ 78; Leathers Dep., Ex. 23 at 19.) The City deferred consideration of the Application to allow the Planning Commission an opportunity to review and make a recommendation in light of these alternate conditions. (Compl. ¶ 58; Leathers Dep., Ex. 23 at 2.) On September 17, 2009, the Planning Commission recommended denial of the Application with the First Alternate Conditions. (Leathers Dep., Ex. 23 at 2.)

Prior to the scheduled October 20, 2009, City Council Hearing, the Church submitted a second amendment to its Application.

13. The City disputes the accuracy of the assessment of the expected parking demand for the property in the Parking Studies. The City contends that the Parking Studies failed to provide necessary, evaluative information concerning the full operating capacity of each facility and the varying person-to-car ratios of the facilities. (DSMF ¶ 63.)

14. It is undisputed that the property was purchased with the express purpose of facilitating the growth of the organization. It was clearly the expectation of both the Plaintiff and the City that the membership of the Church would grow beyond its current active

enrollment of 100 parishioners. It is not clear how the Parking Studies related to that anticipated growth or to address the undisputed fact that, as an Ideal Org, Plaintiff expected to have 100 staff members on site at all times. (DSMF ¶ 35; Pl.'s Resp. SMF ¶ 35; Danos Dep. 82–83.) This latter piece of information, although very telling as to the reasonableness of the City's concerns over adequate on-site parking, does not appear to have been presented to the staff. As the City points out in its briefing, it is clear that the staff struggled with determining the actual capacity of the church in order to calculate a reasonable parking requirement.

(Compl. ¶ 60.) The Church proposed reconfiguring the property's surface lot to increase the total number of parking spaces from 81 to 111. (DSMF ¶ 43; Pl.'s Resp. SMF ¶ 43; Leathers Decl. ¶ 15.) The Church then proposed lowering the occupancy limit to 170 people, based on 111 parking spaces provided after reconfiguration of the surface lot, and applying a parking ratio of 1.5 people per vehicle ("the Second Alternate Conditions"). (PSMF ¶ 78; Defs.' Resp. SMF ¶ 78; Leathers Decl. ¶ 15; Compl. ¶ 60.) The staff recommended approval of the Second Alternate Conditions. (PSMF ¶ 78; Defs.' Resp. SMF ¶ 78; Leathers Decl. ¶ 16; Leathers Dep., Exs. 24 & 25; Compl. ¶ 61.)

### F. City Council Decision

On December 15, 2009, the City Council rejected the Second Alternate Conditions proposing an occupancy limitation based on a concern regarding how to enforce such a limitation, considering the current size of the Church's congregation and its potential for growth as a regional church. (Tr. Dec. 15, 2009, City Council Hearing at 38–40, 46–48, 54–55, Doc. 47–1; Dec. 15, 2009, City Council Minutes at 15–19, Doc. 48–1.) The City Council approved Plaintiff's rezoning Application to allow the use of the property as a church with the condition that the property be limited to 32,053 square feet, but denied Plaintiff's request to expand the use of the property to the proposed 43,916 square feet based on a lack of sufficient parking. (DSMF ¶¶ 27, 28; Pl.'s Resp. SMF ¶¶ 27, 28; Compl. ¶ 64; Dec. 15, 2009, City Council Minutes, Doc. 48–1 at 23–24.)

According to Plaintiff, the City has issued development approval to eleven (11) other churches or places of worship since the City's formation on December 31, 2005, for which the "Church" parking standard (1 parking space per 3.5 fixed seats in the largest assembly area or 1 parking space per 30 square feet in the largest assembly area) was applied rather than the "multi-use" parking standard initially applied to Plaintiff.[15] (PSMF ¶¶ 81–82; Defs.' Resp. SMF ¶¶ 81–82.)

### G. Plaintiff's Complaint

On January 13, 2010, Plaintiff filed its Complaint in this matter against the City of Sandy Springs, its Mayor and Council members in their official capacity ("Defendants"), setting forth the following claims: (1) various violations of RLUIPA, Counts I through III; (2) violations of the rights to free exercise, freedom of speech, freedom of assembly, and freedom of establishment, as guaranteed by the First Amendment, Counts V through VIII; (3) violation of the Equal Protection Clause of the Fourteenth Amendment, Count IX; (4) an unconstitutional taking in violation of the Fifth Amendment, Count X; (5) costs of litigation under RLUIPA and 42 U.S.C. § 1988, Count IV; (6) deprivation of rights guaranteed by the Georgia Constitution and state law, Counts XI and XII; and (7) equitable relief, Counts XIII and XIV.

### H. Parties' Contentions

The parties filed cross motions for summary judgment. Plaintiff sought summary judgment on its RLUIPA claims and its Free Exercise claim only. The City sought summary judgment on all of Plaintiff's substantive claims and claims for relief. In essence, Plaintiff's claim is that the City's conditional approval of its rezon-

---

**15.** The City admits that it has issued development approval to eleven other churches or places of worship. However, the City denies that it always applied the "Church" parking standard as opposed to a "multi-use" parking standard under Section 18.2.1 of the Zoning Ordinance. *See* Section IV(A)(2)(b)(i) *infra.*

ing Application limiting its use of the building to 32,053 square feet and denying its proposed conversion of the 11,193 square foot basement area into religious use (based on the City's failure to apply the City's church parking standard) impinges on Plaintiff's use of the building as a church in accordance with Scientology's Scriptures. As such, Plaintiff asserts that the City's action substantially burdens its religious exercise and discriminates against the Church on the basis of its religious denomination in violation of the First Amendment and RLUIPA. On the other hand, the City contends that Plaintiff has not been denied the use of its building as a church and that the City applied the same parking standard it has applied to other multi-use religious institutions. The City further argues that any burden suffered by Plaintiff is the result of its own actions in purchasing the property prior to the completion of CSI's study on the minimum space requirements for a Class V Ideal Org.

## II. SUMMARY JUDGMENT STANDARD

Both parties have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. The substantive law applicable to the case determines which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual issue is genuine if there is sufficient evidence for a reasonable jury[16] to return a verdict in favor of the non-moving party. *Id.* An issue is material only if its resolution could affect the outcome of the action.

*Id.* Accordingly, when a reasonable jury could not find that the nonmoving party is entitled to a verdict, there is no genuine issue for trial and summary judgment is appropriate. *Id.*

"The district court should resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his favor." *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir.1991) (citations and punctuation omitted). The court may not weigh conflicting evidence or make credibility determinations. *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir.1993), *reh'g denied*, 16 F.3d 1233 (1994) (en banc).

For issues upon which the moving party bears the burden of proof at trial, the moving party must affirmatively demonstrate the absence of a genuine issue of material fact as to each element of its claim on that legal issue. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir.1993). It must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial. *Id.* If the moving party makes such a showing, it is entitled to summary judgment unless the non-moving party comes forward with significant, probative evidence demonstrating the existence of an issue of fact. *Id.* As the United States Supreme Court has stated, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23,

**16.** The Court notes that neither party made a demand for a jury trial in this matter. Therefore, pursuant to Federal Rule of Civil Procedure 39, "issues on which a jury trial is not properly demanded are to be tried by the court."

106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

When the non-moving party bears the burden of proof at trial, however, the moving party is not required to support its motion with affidavits or other similar material negating the opponent's claim. *Id.* Instead, the moving party may point out to the district court that there is an absence of evidence to support an element of the non-moving party's case. *Id.* The non-moving party must then respond with sufficient evidence to withstand a directed verdict motion at trial. Fed.R.Civ.P. 56(e); *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir.1994). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

## III. RIPENESS

At outset of its analysis of Plaintiff's claims in the September 30, 2011, Order, the Court expressed its concern as to whether Plaintiff's claims were ripe. Based on the Court's review of the record as presented by the parties at that time, it appeared that Plaintiff failed to apply for a variance from the parking requirement as multiple iterations of the City Planning Department Staff Reports shared with the Plaintiff indicated the Department's suggestion that a variance might address the parking issue. (*See* Leathers Dep., Ex. 20 at 8; Leathers Dep. Ex. 21 at 8; PSMF ¶ 51; Defs.' Resp. SMF ¶ 51.) Thus, the Court noted that "because Plaintiff failed to avail itself of this remedy, it is possible that the City's decision as to the property's proposed expansion is subject to modification via a variance and therefore not final." *See Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1573–74 (11th Cir.1989), *re'g denied, en banc*, 893 F.2d 346 (1989)

(noting that courts have found an absence of finality where property owners did not avail themselves of the opportunities provided by state or federal statute to seek variances or waivers from zoning decisions); *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 352 (2d Cir.2005) (finding that the plaintiffs' failure to apply for a variance deprived the court of any certainty as to what use of the plaintiff's property would be permitted). However, as noted above, it is now clear that Plaintiff did in fact make an early request for a variance as to the number of required on-site parking spaces but subsequently withdrew the request after a City planner initially handling the application informed Plaintiff a variance was unnecessary. The Staff Reports referenced above were issued and provided to the City Planning Commission and later to the City Council as foundational predicates to their formal review of the Church's rezoning request.

▌ Ripeness, a doctrine rooted in both Article III's case or controversy requirement and prudential limitations on the exercise of judicial authority, goes to whether the district court has subject matter jurisdiction to hear the case and therefore may be raised *sua sponte* by the court. *See Greenbriar, Ltd.*, 881 F.2d at 1574 n. 7; *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1224 (11th Cir. 2004). "The purpose of the ripeness doctrine is 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.'" *Midrash*, 366 F.3d at 1224 (*quoting Abbott Labs. v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *abrogated on other grounds by, Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977)).

The Eleventh Circuit has held that the decision of a municipality is not ripe for review unless that decision is final and

definite with respect to the property at issue, relying on the Supreme Court's ripeness test in *Williamson County Regional Planning Commission v. Hamilton Bank,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). *See Greenbriar, Ltd.,* 881 F.2d at 1573–74 (11th Cir.1989) (citing *Williamson County,* 473 U.S. 172, 186–87, 105 S.Ct. 3108 (1985)); *Eide v. Sarasota County,* 908 F.2d 716, 724–27 (11th Cir.1990) (following *Greenbriar's* holding and requiring that the zoning decision under attack be finally made and applied to the property at issue). As noted by the Second Circuit in *Murphy* in the context of RLUIPA, "the *Williamson County* ripeness test is a fact-sensitive inquiry that may, when circumstances warrant, be applicable to various types of land use challenges." 402 F.3d at 350 (citing RLUIPA's legislative history as support for the proposition that RLUIPA was not intended to "relieve religious institutions from applying for variances, special permits or exceptions, where available without discrimination or unfair delay").

▪ In deciding whether a claim is ripe for adjudication or review, the court should look primarily at two considerations: (1) the fitness of the issues for judicial decision, and (2) the hardship to the parties of withholding court consideration. *Midrash,* 366 F.3d at 1224. In an as-applied challenge to a zoning ordinance, the plaintiff is not required to obtain a final decision if pursuing an appeal to a zoning board of appeals or seeking a variance would be futile. *See, e.g., Eide,* 908 F.2d at 727–28; *Murphy,* 402 F.3d at 350. In other words, "a property owner need not pursue such applications when a zoning agency lacks discretion to grant variances or has dug in its heels and made clear that

all such applications will be denied." *Murphy,* 402 F.3d at 350 (*citing Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1012 n. 3, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (stating that an application for a variance is not required when it would be "pointless")).

▪ In their supplemental briefing, both parties contend that Plaintiff's claims are ripe. The parties appear to agree that the City Council's conditional approval of Plaintiff's Rezoning Application was a final decision. (*See* Docs. 87, 88.) Plaintiff contends that the City's zoning decision is a final decision because it can be modified only by City Council action on another zoning petition.[17] Plaintiff also asserts that a second attempt to seek a variance from the City's parking requirement, after 8 months of failed negotiations with the City, would have been futile. The City contends the zoning conditions attached to the Church's property by the City's rezoning decision cannot be modified by a variance under the terms of the Ordinance. According to the City, "absent a second and independent rezoning by the City, the zoning conditions limiting the church use on the Subject Property to 32,053 square feet cannot be lifted or modified." (Doc. 87 at 3.)

The City's Zoning Ordinance does not allow for a variance to increase the density or change the use approved under a rezoning. (Zoning Ordinance § 22.2.4 D.) A variance is available only to provide relief from the strict application of the general provisions of the Zoning Ordinance and cannot be applied to zoning conditions which relate to a specific property. (*See* Zoning Ordinance § 22.3.) Thus, it appears that by attaching conditions to Plaintiff's use of the property in its rezoning, the

---

**17.** As such, Plaintiff asserts that it will suffer a great hardship if it is forced to resubmit a zoning application with a concurrent variance for parking, after initially seeking such a variance with its original rezoning application which was withdrawn in reliance on the representation of the City's Staff that no variance was needed.

City has limited Plaintiff's ability under the Zoning Ordinance to simply seek a variance from the parking requirement. Although the Court is not convinced that the City's conditional zoning approval could not be modified by the issuance of a concurrent variance on a subsequent petition for a rezoning, the Court need not reach the issue because the Court finds that a subsequent attempt by Plaintiff to obtain a variance would in fact prove futile. Indeed, in its supplemental brief addressing the ripeness issue, the City inexplicably asserts that "[e]ven if a variance from the City's parking requirements were to be issued, Plaintiff still cannot expand its facility on the Subject Property by eliminating the basement parking garage because of the zoning conditions on the Subject Property." (Doc. 87 at 3.) Accordingly, it is apparent that the City has made clear that any request by Plaintiff to reduce the number of on-site parking spaces and to expand the use of its basement for church use will be denied at this juncture.

## IV. ANALYSIS

The Court will now address the merits of the parties' cross motions for summary judgment. Plaintiff's motion seeks partial summary judgment on its RLUIPA claims (Counts I—III) and its free exercise claim (Count V) and requests an award of compensatory damages pursuant to 42 U.S.C. § 1983. Defendants' motion seeks summary judgment on all of Plaintiff's substantive claims (Counts I—III, and V—XII), and Plaintiff's claims for costs, damages and equitable relief (Counts IV, XIII and XIV).

## A. RLUIPA

Both parties seek summary judgment with respect to Plaintiff's RLUIPA claims (Counts I, II, and III). Plaintiff argues that the City's conditional approval of its rezoning application—which limits the use of the building to the existing 32,053 square foot office building and excludes the proposed use of the 11,863 square foot basement for a chapel, executive offices, and classrooms—is a violation of RLUIPA and its right to the free exercise of its religion. The Complaint alleges that the City violated RLUIPA in the following ways: (1) by imposing and implementing a land use regulation that substantially burdens religious exercise (Count I); (2) by applying the zoning ordinance in a way that treats this religious organization on less than equal terms with other religious and non-religious assemblies (Count II); (3) by implementing a land use regulation in a manner than discriminates on the basis of religion (Count II); and (4) by imposing a land use regulation that unreasonably limits religious assemblies, institutions, and structures within the City (Count III).[18]

RLUIPA[19] prohibits governments from imposing a "substantial burden" on the

---

18. Count II of Plaintiff's Complaint is titled "Discrimination on the Basis of Religion" and appears to be a claim under 42 U.S.C. § 2000cc(b)(2), RLUIPA's nondiscrimination provision. However, Plaintiff lumps an equal terms violation under 42 U.S.C. § 2000cc(b)(1) into the same count as its nondiscrimination argument and makes no attempt to distinguish these provisions. The Court construes the Complaint as alleging both violations.

19. RLUIPA is a statutory codification of the Constitution's free exercise, establishment, and equal protection clauses in the context of land use regulation (and, although not relevant here, institutionalized persons). *See generally Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1225 (11th Cir.2004); *Konikov v. Orange County*, 410 F.3d 1317, 1319 n. 1 (11th Cir.2005). Because Plaintiff's constitutional claims are inextricably intertwined with its RLUIPA claims, the Court need not separately address Plaintiff's constitutional claims where the relevant analysis would be duplicative. Rather, the Court will *note whether triable issues remain as to any*

religious exercise of a person or a religious assembly by imposing a land use regulation, unless that land use regulation is necessary to further a compelling state interest. 42 U.S.C. § 2000cc(a)(1). In addition, governments may not impose land use regulations that treat religious institutions on less than equal terms with secular institutions, discriminate against religious institutions, or unreasonably limit religious institutions. 42 U.S.C. § 2000cc(b). A land use regulation is defined as "a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land), if the claimant has an ownership, leasehold, easement, servitude or other property interest in the regulated land or a contract or option to acquire such an interest." 42 U.S.C. § 2000cc–5(5).

### 1. Section (a) Substantial Burden Provision

The Court's analysis of the Church's claim under Section (a) of RLUIPA involves three considerations: (1) whether the City made an individual assessment of the Church's proposed use of the property such that RLUIPA applies; (2) whether the Church has established a prima facie case that the City has imposed a substantial burden on its religious exercise; and (3) if the Church establishes its prima facie case, whether the City can justify the burden imposed by demonstrating a compelling interest achieved by the least restrictive means. *See Midrash Sephardi, Inc. v. Town of Surfside,* 366 F.3d 1214, 1225 (11th Cir.2004); *Konikov v. Orange County,* 410 F.3d 1317, 1323 (11th Cir.2005).

of Plaintiff's constitutional claims following its analysis under the relevant provisions of

### a. Whether the City Made an Individualized Assessment

First, RLUIPA's "individualized assessment test" has been characterized by the Eleventh Circuit as a jurisdictional determination. *Midrash,* 366 F.3d 1214, 1225; *Hollywood Community Synagogue, Inc. v. City of Hollywood,* 430 F.Supp.2d 1296 (S.D.Fla.2006). The Court has jurisdiction over the City's alleged violation of Section (a) of RLUIPA only if the Church can show that the "burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes … individualized assessments of the proposed uses for the property involved." 42 U.S.C. § 2000cc(a)(2)(C). An individualized assessment involves a "case-by-case evaluation of the proposed activity." *Midrash,* 366 F.3d at 1225.

Plaintiff's Complaint alleges that "[b]y the imposition and implementation of a land use regulation that imposes a substantial burden on the Church's exercise of the Scientology religion within the City of Sandy Springs, Defendants made an individualized assessment of the proposed uses for the property involved." (Compl. ¶ 73.) Plaintiff asserts in its motion that the City does not dispute that its treatment of the Church's zoning application constitutes an individualized assessment. (Pl.'s Br. Summ. J. at 32.) However, in its Answer, the City denied Plaintiff's allegation that the City made an individualized assessment. (Answer ¶ 73.) The City contends that Section 18.2.1 of the Zoning Ordinance is neutral and generally applied to determine the required amount of parking. (Defs.' Br. Summ. J. at 11.) According to the City,

RLUIPA.

[The Parking Ordinance] establishes a table of parking standards keyed to types of uses. Zoning Ord. § 18.2.1. All of the terms in the table are neutrally defined in the Zoning Ordinance based on the nature of the operative use. Zoning Ord. § 3.3.1. In order to calculate required parking Defendants find a use on the table in Section 18.2.1 that best captures the applicant's proposed primary use or uses and then applies the parking standard that correlates to that use or uses assuming the facility operates at maximum capacity. Doc. 42–1 p. 77–79; Leathers Decl. ¶ 6. If the parking standard appears inadequate or has the effect of creating an adverse situation, the Zoning Ordinance affords the City Council flexibility to impose additional mitigating conditions. Zoning Ord. § 28.1 ¶ 3.

(Defs.' Br. Summ. J. at 11–12.)

■ Even where the government's regulation is neutral and generally applicable, its application to particular facts can constitute an individualized assessment, particularly where "the application does not involve a mere numerical or mechanistic assessment," but involves criteria that are at least partially subjective in nature.[20] *Living Water Church of God v. Charter Township of Meridian,* 384 F.Supp.2d 1123, 1130 (W.D.Mich.2005), *rev'd on other grounds,* 258 Fed.Appx. 729 (6th Cir.2007); *Westchester Day School v. Village of Mamaroneck ("Westchester Day School VI"),* 417 F.Supp.2d 477, 541–42 (S.D.N.Y.2006),

*aff'd* 504 F.3d 338 (2d Cir.2007). In *Lighthouse Community Church of God v. City of Southfield,* the court found no individualized assessment where the government's application of a parking ordinance—requiring the addition of all the uses of the building (including the worship space, Sunday school classrooms, and administrative offices) to calculate the total number of required parking spaces—involved a numerical application with no subjective element. 2007 WL 30280, at *6 (E.D.Mich. Jan. 3, 2007).[21] The Court went on to find, however, that the Zoning Board of Appeals' ("ZBA") denial of the plaintiff's request for a parking variance, being partially subjective in nature, was an individualized assessment since the ZBA is able to authorize relaxation of the ordinance provisions and to grant variances in certain cases. *Id.* at *7.

■ Here, as in *Lighthouse Community Church of God,* the Parking Ordinance, which provides that "[p]arking requirements shall be calculated based on the proportion that each use contributes to the total," appears to be a law of general and neutral numerical application with no subjective element. However, the City's application of the Parking Ordinance to the Church was based on consideration of the Church's individual case.

The staff determined that Plaintiff did not meet the definition of a "church" under the Zoning Ordinance based on information provided by Plaintiff during the rezon-

---

**20.** Several courts have found that special use permit and variance applications involve individualized assessments. *See Fortress Bible Church v. Feiner,* 734 F.Supp.2d 409, 498–99 (S.D.N.Y.2010); *Living Water Church of God v. Charter Township of Meridian,* 384 F.Supp.2d 1123, 1130–31 (W.D.Mich.2005), *rev'd on other grounds,* 258 Fed.Appx. 729 (6th Cir.2007); *Guru Nanak Sikh Society of Yuba City v. County of Sutter,* 326 F.Supp.2d 1140, 1160 n. 10 (E.D.Cal.2003), *aff'd,* 456 F.3d 978 (9th Cir.2006).

**21.** The parties in *Lighthouse Community Church of God* raised strikingly similar arguments to those posed by the parties here. For example, the plaintiff there asserted that (1) because all the uses of the building will not be used concurrently, it is improper to add all of the uses together when calculating parking spaces; and (2) the city has not uniformly applied the parking requirement in previous instances and was applying it against the plaintiff in an individualized manner. 2007 WL 30280, at *6.

ing process. A "Church, Temple or Place of Worship" is defined in the Zoning Ordinance as "[a] facility in which persons regularly assemble for religious ceremonies. This shall include, on the same lot, accessory structures and uses such as minister's and caretaker's residences, and other uses identified under the provisions for Administrative and Use Permits." (Zoning Ordinance § 3.3.3, Doc. 49–1 at 15.) Here, "[s]ince Plaintiff was not an assembly-type use, Defendants determined that application of the 'church' use parking standard was inadequate to determine what level of parking was sufficient to service the proposed use," the staff used its flexibility to impose additional mitigating conditions pursuant to Section 28.1. (Defs.' Br. Summ. J. at 12–13.)

According to the Staff Reports,

Article 18.2.1 indicates parking requirements are to be calculated based upon the proportion that each use contributes to the total. For example, a building with multiple uses would be required to provide parking based upon the total parking requirement associated with each use. On the other hand, parking requirements for uses with large public assembly areas relative to the remainder of the building (i.e. meeting halls or libraries) are based upon the largest public assembly area. Normally, staff would analyze the parking needs for the Church of Scientology building relative to the size of the sanctuary. However, because proposed development will have a sanctuary which comprises less than 5% of the total net floor area, staff has instead analyzed the parking impact using an aggregate of the uses in the building (sanctuary, offices and classrooms).

(Doc. 42–2, Ex. 20 at 19, R000173.) The City found that the lack of adequate parking "could cause an excessive or burdensome use of the existing infrastructure."

Based on this concern, the staff deviated from its normal practice of analyzing the parking needs for a church building relative to the size of the sanctuary without requiring additional parking for accessory uses, and instead applied a multi-use formula in its initial parking calculation. *Id.* Subsequently, the staff considered the Parking Studies and the Alternate Conditions submitted by Plaintiff and revised its parking calculation to reduce the number of parking spaces required for Plaintiff's property. Thus, the Court finds that the City made an individualized assessment of the Church's proposed use of the property by taking into account the particular details of Plaintiff's proposed use of the property in its conditional approval of Plaintiff's rezoning Application. *Midrash,* 366 F.3d at 1225; *Guru Nanak Sikh Society of Yuba City,* 456 F.3d at 986 (holding that RLUIPA applies when the government may take into account the particular details of an applicant's proposed use of land when deciding to permit or deny that use).

### b. Whether the City's Decision Imposed a Substantial Burden on the Church's Religious Exercise

■ Section (a) of RLUIPA provides in relevant part:

No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—(A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1). Plaintiff bears the burden of establishing a prima facie case under Section (a) of RLUIPA that the City has imposed a substantial burden on

its religious exercise. 42 U.S.C. § 2000cc–2(b); *Midrash*, 366 F.3d at 1225. If Plaintiff makes such a showing, then the burden shifts to the City to demonstrate that the challenged imposition or implementation of the Ordinance "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc(a)(1)(A)-(B). Under RLUIPA, "religious exercise" includes the "use, building or conversion of real property for the purpose of religious exercise." 42 U.S.C. § 2000cc–5(7)(B); *Midrash*, 366 F.3d at 1225 ("In passing RLUIPA, Congress recognized that places of assembly are needed to facilitate religious practices, as well as the possibility that local governments may use zoning regulations to prevent religious groups from using land for such purposes."). It is not necessary that religious exercise be "compelled by, or central to, a system of religious belief" in order to be protected under RLUIPA.[22] *Midrash*, 366 F.3d at 1225. Therefore, the question is whether the application of the City's Parking Ordinance imposes a "substantial burden" on Plaintiff's use and/or conversion of its property for the purpose of religious exercise. *Id.*

RLUIPA does not define the term "substantial burden." As a result, courts have looked to the Supreme Court's definition of substantial burden in its free exercise jurisprudence. E.g., *Midrash*, 366 F.3d at 1225 (citing cases). The Eleventh Circuit has held that a substantial burden "must place more than an inconvenience on religious exercise ... [it] is akin to significant pressure which directly coerces the religious adherent to conform his or her be-

havior accordingly. Thus, a substantial burden can result from pressure that tends to force adherents to forego religious precepts or from pressure that mandates religious conduct." *Id.* at 1227; *Westchester Day Sch. v. Vill. of Mamaroneck* ("Westchester Day School V"), 504 F.3d 338, 349 (2d Cir.2007) ("when there has been a denial of a religious institution's building application, courts appropriately speak of government action that directly coerces the religious institution to change its behavior, rather than government action that forces the religious entity to choose between religious precepts and government benefits ... [w]here the denial of an institution's application to build will have minimal impact on the institution's religious exercise, it does not constitute a substantial burden, even when the denial is definitive. There must exist a close nexus between the coerced or impeded conduct and the institution's religious exercise for such conduct to be a substantial burden on that religious exercise"); *Living Water Church of God v. Charter Twp. Of Meridian*, 258 Fed.Appx. 729, 741 (6th Cir.2007) (finding that while the township's action will require the church to incur increased expense and to endure increased inconvenience if it is not able to build a facility of the *desired* size, the township's action did not impose a substantial burden where the action did not require the church to violate, modify, or forego its religious beliefs or precepts); *Williams Island Synagogue, Inc. v. City of Aventura*, 329 F.Supp.2d 1319, 1325–26 (S.D.Fla.2004).

 In the "Free Exercise" First Amendment context,[23] the Supreme Court

---

22. Accordingly, the City's argument that its Parking Ordinance does not impose a substantial burden because "Scientology does not have any beliefs, practices, or religious mandates with respect to parking at its facilities" fails as a matter of law. (*See* Defs.' Br. Summ. J. at 15.)

23. As of this date, the Supreme Court has not specifically applied or defined "substantial burden" under RLUIPA in the land use context.

has made clear that the substantial burden hurdle is high and that determining its existence is fact intensive. *See, e.g., Hobbie v. Unemployment Appeals Comm'n,* 480 U.S. 136, 141, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987) (finding burden when government puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs"); *Wisconsin v. Yoder,* 406 U.S. 205, 234–35, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (finding that compulsory school attendance law and criminal sanctions for noncompliance interfered with free exercise rights of Amish); *Sherbert v. Verner,* 374 U.S. 398, 404, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (finding burden when individual is required "to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion ... on the other hand"). *But see Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 450–51, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988) (no burden where government action interferes with, but does not coerce, individual's beliefs); *Braunfeld v. Brown,* 366 U.S. 599, 605, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961) (no burden where regulation made religious observation more expensive). *See also Living Water Church of God,* 258 Fed.Appx. at 734 (citing cases). "Courts must ensure that the facts warrant protection under RLUIPA, rather than simply granting a blanket immunity from zoning laws." *Westchester Day Sch. IV,* 417 F.Supp.2d at 544; *Living Water Church of God,* 258 Fed.Appx. at 736 (noting that "a substantial burden is a difficult threshold to cross. If the term substantial burden is not to be read out of the statute, RLUIPA cannot stand for the proposition that a construction plan is immune from a town's zoning ordinance simply because the insti-

tution undertaking the construction pursues a religious mission.").

Plaintiff argues that "the inability to utilize the entire 43,916 square feet of the existing building [24] owned by the Church of Scientology is far more than an inconvenience" and constitutes a substantial burden for the following reasons: (1) the Church cannot meet its religious needs with the 32,053 square foot limitation on the building; (2) restricting the Church's ability to use the whole building would severely compromise the religious programs the Church can offer its congregants, depriving them of the opportunity to fully practice their religion; (3) denying the Church the ability to utilize the basement would require the Church to revise its existing renovation plans and re-engineer the structural support of the building, which would be prohibitively expensive; (4) alternatively, if the Church were unable to use the entire 43,916 square foot building, it would have to sell the property and relocate; and (5) assuming the Church were able to find a property of suitable size and location, there will be delay, uncertainty, and a great deal of expense. (*See* Pl.'s Br. Summt. J. at 36–37.)

The implementation of a land use regulation that completely bars the use of the property for religious exercise *may* constitute a substantial burden. *See DiLaura v. Twp. of Ann Arbor,* 112 Fed. Appx. 445, 446 (6th Cir.2004) (finding that "designation as a bed and breakfast would have effectively barred the plaintiffs from using the property in the exercise of their religion and, hence, the defendants' refusal to allow a variance constituted a substantial burden on that exercise."); *Lighthouse Community Church of God,* 2007 WL 30280, at *7–9 (denying city's motion for

---

24. As indicated in the Plaintiff's rezoning application, the plaintiff sought approval to expand the building from 32,053 square feet to 43,916 square feet by converting the 11,193 square foot basement/garage area to religious uses.

summary judgment and holding that plaintiff established a prima facie case under RLUIPA where the city's denial of the church's application for certificate of occupancy was based on a lack of adequate parking, thereby totally precluding the church from using the building for religious worship purposes); *Reaching Hearts Int'l, Inc. v. Prince George's County,* 584 F.Supp.2d 766, 785–87 (D.Md.2008), *aff'd* 368 Fed.Appx. 370 (denying county's motion for judgment as a matter of law following jury trial and finding that sufficient evidence supported the jury's finding that county's actions restricting religious congregation's ability to build church on only 0.7 acres out of its 17–acre parcel imposed a substantial burden on the congregation's religious exercise in violation of RLUIPA); *Cottonwood Christian Center v. Cypress Redevelopment Agency,* 218 F.Supp.2d 1203, 1226 (C.D.Cal.2002) ("Preventing a church from building a worship site fundamentally inhibits its ability to practice its religion. Churches are central to the religious exercise of most religions. If Cottonwood could not build a church, it could not exist.").

■ On the other hand, no substantial burden is imposed where the government action may make religious exercise more expensive or difficult but does not place substantial pressure on a religious institution to violate or forego its religious beliefs and does not effectively bar a religious institution from using its property in the exercise of its religion. *See Vision Church v. Village of Long Grove,* 468 F.3d 975, 997–1000 (7th Cir.2006) (noting that because the church would be permitted to build a smaller facility under the village's ordinance, the court held that the village's conditions on the approval of the permit limiting the size of the building, the number of services, and the number of major activities to be conducted did not impose a substantial burden on the church's religious exercise); *Living Water Church of God,* 258 Fed.Appx. at 739–741, (citing *Midrash,* 366 F.3d at 1227) (finding that the inability of a church to construct its "ideal building" does not constitute a substantial burden); *Westchester Day School V,* 504 F.3d at 349 (noting that "when the denial of a religious institution's application to build is not absolute, such would not necessarily place substantial pressure on the institution to alter its behavior," but also recognizing that "a conditional denial may represent a substantial burden if the condition itself is a burden on free exercise, the required modifications are economically unfeasible, or where a zoning board's stated willingness to consider a modified plan is disingenuous"); *Corporation of Presiding Bishop of Church of Jesus Christ of Latter–Day Saints v. City of West Linn,* 192 Or.App. 567, 86 P.3d 1140, 1156 (Or.Ct.App.2004) (finding, in part, that the burden resulting from the city's decision prohibiting the church from constructing the particular design of building and parking lot that it proposed on the particular property did not constitute a "substantial burden" under RLUIPA where the record did not indicate that the particular size building or design proposed was required by its religious beliefs).

Plaintiff's professed burdens in the instant case are nearly identical to those alleged by the church in *Living Water Church of God.* There, although the church's request to build a religious school was granted (but denied as to its requested size), the Church argued that anything less than the addition of a 35,000 square foot building on its property prevented it from fulfilling its ministries and missions. *Living Water Church of God,* 258 Fed. Appx. at 737. Noting that "RLUIPA does not protect the church from all land use regulation, but only from those regulations that substantially burden its religious exercise," the court reasoned that simply because the church's current facility is too

small does not give the church "free reign to construct on its lot a building of whatever size it chooses, regardless of the limitations imposed by the zoning ordinance." *Id.* at 739.

> Ideally, no doubt, Living Water would have an unlimited and ever-expanding place of worship with open doors to all who are interested—the same would surely apply to its school. The Township's action here, and the zoning ordinance in general, burdens this hope and objective. And although the Township's action may make Living Water's religious exercise more expensive or difficult, we cannot say that it places substantial pressure on this religious institution to violate its religious beliefs or that it effectively bars the institution from using its property in the exercise of its religion.

*Id.* Accordingly, the court found no substantial burden where the church failed to demonstrate that the Township's imposition of size restrictions prevented it from carrying out the full scope of its current church missions and ministries but "demonstrated only that it cannot operate its church on the scale it desires." *Id.* at 741.[25]

■ A government may regulate the number of parking spaces required for a church facility or restrict the size of assemblies or institutions, and as long as such restrictions are unrelated to the religious characterization of the property, RLUIPA is not implicated. *Midrash,* 366 F.3d at 1234 n. 17. Moreover, the Eleventh

Circuit has held that where a religious organization has not shown that its property carries religious significance, the inability to relocate a religious facility is not a substantial burden under RLUIPA. *Id.* at 1227 n. 11 ("That the congregations may be unable to find suitable alternative space does not create a substantial burden within the meaning of RLUIPA."); *Hollywood Community Synagogue, Inc.,* 430 F.Supp.2d at 1318–19.

■ The City's motion contends that Plaintiff is entitled to use the existing facility on the subject property for the practice of Scientology and that while the current facility might be less than "ideal," Plaintiff has made no showing that it is impossible to practice Scientology in the existing facility. (Defs.' Br. at 15.) Plaintiff, a Class V Organization, currently practices Scientology in a facility one-quarter of the size of the subject property. Notably, Plaintiff does not assert that the City's action in denying its proposed use of the property has coerced or forced Plaintiff into foregoing practicing the religious precepts of Scientology. Rather, Plaintiff relies on the Affidavit of Deborah Danos to support its assertion that the Church does not presently have adequate space to provide the necessary Training, Auditing and other religious services mandated by Scientology and that the inability to utilize the entire 43,916 square feet of the existing building is "far more than an inconvenience." In applying RLUIPA, however, "the Court is not concerned simply with the inadequacy

---

25. In so ruling, the Sixth Circuit relied on its earlier finding that "[e]ven if Living Water's current needs are not the proper measuring stick, we do not find a substantial burden. Living Water has a building in which to worship. It may conduct its ministries and programs. It has permission to construct a school on its property, and it can build an additional 14,000 square-foot building without obtaining an SUP. While Living Water has outgrown its current facility, the record does not contain the kind of facts that would permit a finding that the building which the church can construct without an additional SUP would be so inadequate as to substantially burden Living Water's religious exercise in the future. RLUIPA does not protect the church from all land use regulation, but only from those regulations that substantially burden its religious exercise." *Id.* at 739.

of Plaintiff's current location or the adequacy of the proposed location. Instead, the Court is required to determine whether Defendant's application of this Land Use Regulation has imposed pressure so significant as to require Plaintiff's congregation to forego their religious beliefs." *Williams Island Synagogue,* 329 F.Supp.2d at 1326.

In her deposition, Ms. Danos testified that the Church's 11,000 square foot Dunwoody facility provided adequate space to accommodate the number of people who presently want to practice Scientology at the facility. (Danos Dep. 36:12–38:24). However, Ms. Danos further testified that "when you cannot deliver in the ideal fashion, people don't come." (Danos Dep. 38:21–23). Although Plaintiff contends that 40,000 square feet is the minimum space required for an Ideal Organization, nothing in its written Scriptures mandates a building of 40,000 square feet in order to meet all of Scientology's necessary religious services. (Danos Dep. 122:22–123:11). There exists no document specifying the physical requirements for an Ideal Org. Rather, guidelines as to the physical requirements of an Ideal Org are part of a template created by CSI gleaned from bits and pieces of Hubbard's writings. *Id.* Although it is referred to as an Ideal Org, not all steps of the Bridge to Total Freedom can be achieved at such a facility.[26] (Danos Dep. 99:3–9). In terms of implementation, Scientology is "at the forefront of the Ideal Org evolution, there are not so many." (Danos Dep. 90:23–24; *see also* Wright Aff. ¶ 7) ("At first, there were no standards in place. We were trying out different concepts and evolving those concepts as we went along.") Even as recently as December 2010, as many as 90% of the existing Class V Scientology churches were "not of the correct size to house all the functions." (Wright Aff. ¶ 4.)

█ The City further contends that any burden experienced due to a lack of space on the subject property is self-imposed and not a result of the City's denial of Plaintiff's proposed expansion. (*Id.* at 16.) Plaintiff purchased the property in 2005 before CSI had completed its study of the minimum space requirements necessary to house those services. (Wright Dep. 44–46.) Plaintiff waited nearly four years after its purchase to seek approval of its rezoning and proposed use of the property in 2009. (Danos Aff. ¶¶ 6, 13.) Alternatively, Plaintiff has not asserted that the subject property has any religious significance to its practice of Scientology. Therefore, any financial burden Plaintiff may suffer as a result of being forced to locate a suitable alternative facility does not constitute a substantial burden under RLUIPA. Moreover, a genuine issue of material fact exists as to whether Plaintiff's own actions caused its burden as opposed to the City's conditioned approval limiting the size of the facility on the property.[27] *Adhi Parasakthi Charitable, Medical, Educational, and Cultural Society of North America v. West Pikeland,* 721 F.Supp.2d 361, 378–79 (E.D.Pa.2010) ("Plaintiff chose to have the property blessed before it had received approval from Defendant for its conditional use. Plaintiff therefore voluntarily took actions that caused impingement. We cannot find that the Free Exercise Clause protects a plaintiff that willfully ties itself to a plot of land, knowing that zoning approval is re-

---

**26.** Indeed, even this location as planned does not provide for a testing center. (*See* Checklist, Doc. 67–1 at 10.)

**27.** In addition, according to the Checklist performed prior to approval of the property for purchase, Plaintiff indicated that the rezoning approval should be secured prior to purchase. (*See* Checklist, Doc. 67–2 at 3.)

quired for its desired use, and then demands that the zoning board not apply an ordinance to it because denying the desired use would impinge its exercise of religion.").

In light of these standards and based on the facts presented by both parties, the Court cannot hold that Plaintiff has been substantially burdened by the City's conditional approval as a matter of law. The Zoning Ordinance permits the use of the property as a church and the City approved Plaintiff's use of the entire property as a church subject to restrictions on its size to ensure adequate parking.[28] *See Midrash*, 366 F.3d at 1227 n. 11 (noting that reasonable "run of the mill" zoning considerations such as size, congruity with existing uses, and availability of parking do not constitute substantial burdens on religious exercise). The City's action allows the use of the entire facility as it exists, with 3 2,053 square feet of improved space and 11,193 square feet of basement garage space serving, in part, as on-site parking. The City's Staff Report also indicated that Plaintiff's proposed expansion could be approved with either a variance from the minimum parking requirements, a shared on-site parking arrangement, or by obtaining sufficient off-site parking.

■ On the other hand, neither can the Court conclude that Plaintiff has not been substantially burdened by the City's conditional approval as a matter of law. *See Westchester Day School v. Village of Mamaroneck ("Westchester Day School II")*, 386 F.3d 183, 188–89 (2d Cir.2004) (finding that summary judgment may not properly be granted unless the record compels each finding of fact necessary to the judgment and remanding to district court for bench trial on RLUIPA claims). The Court finds that genuine issues of material fact exist regarding whether the City's conditional approval effectively bars Plaintiff's use of its property for the practice of Scientology as mandated by its scriptures, thereby imposing a substantial burden on its religious exercise.[29] *See Living Water Church of God*, 258 Fed.Appx. at 741 (noting that the Court's finding of no substantial burden was grounded on the facts before it and that if the plaintiff proffered evidence showing that it cannot carry out its church missions and ministries due to the government's actions it might have reached a different outcome); *Westchester Day School V*, 504 F.3d at 352–53 (finding that zoning board's denial of Jewish day school's application for expansion was a substantial burden under RLUIPA where the "existing facilities are deficient," the school's "effectiveness in providing the education Orthodox Judaism mandates has been significantly hindered as a consequence" of the board's actions, and the school had no "ready alternative" to the

---

**28.** Plaintiff complains that the City Council's rejection of its proposed Alternate Condition limiting the occupancy of the building to 170 people imposes a substantial burden on its use of the property for religious exercise. The Court notes that had such a limitation been imposed, absent the parties' binding consent, it might possibly be viewed later as constituting a substantial burden on religious exercise in violation of RLUIPA because limiting the number of people who may attend a church would result in "turning people away" from religious services. *See Murphy v. Zoning Com'n of Town of New Milford*, 289 F.Supp.2d 87, 113–14 (D.Conn.2003), *vac'd on other grounds* in 402 F.3d 342 (2d Cir.2005)(holding that because plaintiff's claims were never ripe for judicial intervention, the district court's permanent injunction should be vacated and the plaintiff's complaint dismissed).

**29.** This conclusion does not foreclose the possibility that a directed verdict could be granted if the evidence at trial is insufficient to show a substantial burden on Plaintiff's ability to use its property for religious exercise by forcing Plaintiff to forego the practice of Scientology such that no reasonable factfinder could find in Plaintiff's favor on this issue.

plan for which the zoning board denied a construction application); *Hernandez v. Commissioner*, 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989) ("It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds."). Because there is a substantial factual dispute regarding whether and to what degree Plaintiff was burdened by the City's action, the Court cannot resolve Plaintiff's claim on summary judgment. *See Williams Island Synagogue, Inc.*, 329 F.Supp.2d at 1325–26; *Bikur Cholim, Inc. v. Village of Suffern*, 664 F.Supp.2d 267, 291 (S.D.N.Y.2009); *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir.1986) ("Of the three elements required to establish a prima facie case … two continue as unresolved issues of fact. Summary judgment is justified only for those cases devoid of any need for factual determinations.") (internal quotations and citations omitted).

As this threshold issue for resolution of a claim under RLUIPA remains outstanding, the Court need not reach the question of whether the City can justify the burden created by articulating a compelling government interest. *Midrash*, 366 F.3d at 1228; *Williams Island Synagogue, Inc.*, 329 F.Supp.2d at 1326. Accordingly, the parties' cross motions for summary judgment on Count I are denied.[30]

### 2. Section (b): Equal Terms, Nondiscrimination, Exclusions, and Limits

Plaintiff's remaining RLUIPA claims are brought pursuant to 42 U.S.C. § 2000cc(b), which provides as follows:

(1) Equal terms. No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.

(2) Nondiscrimination. No government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination.

(3) Exclusions and limits. No government shall impose or implement a land use regulation that—(A) totally excludes religious assemblies from a jurisdiction; or (B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction.

 When bringing a claim under section (b) the plaintiff is not required to demonstrate a substantial burden. *See Midrash*, 366 F.3d at 1229–35 (finding that a zoning ordinance prohibiting churches in a certain district violated RLUIPA's equal terms provision although it did not impose a substantial burden on plaintiffs); *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 262 (3rd Cir. 2007); *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 762 (7th Cir.2003) ("the substantial burden and nondiscrimination provisions are operatively independent of one another"). Plaintiff has alleged violations of each of section (b)'s three subdivisions which the Court addresses separately in turn below.

### a. RLUIPA's Equal Terms Provision

 The central premise behind RLUIPA's equal terms provision is that a land use regulation may not treat a religious assembly or institution on less than equal terms than a nonreligious assembly or institution. 42 U.S.C. § 2000cc(b)(1). Count II of Plaintiff's Complaint alleges

---

**30.** For these same reasons, the parties' motions for summary judgment on Plaintiff's free exercise claim (Count V) are denied and the City's motion for summary judgment on Plaintiff's freedom of assembly claim (Count VIII) is denied.

that "[t]he Zoning Ordinance, as applied to the Church, treats this religious organization and institution on less than equal terms with other *religious and non-religious* assemblies and institutions in the City." (Compl.¶ 78) (emphasis added). Plaintiff points to several instances in which it alleges the City treated other similarly situated religious organizations more favorably in terms of its application of the Parking Ordinance. However, RLUIPA's equal-terms provision does not require that all religious entities be treated similarly, but instead requires that religious entities be treated equally to nonreligious entities. *West Pikeland*, 721 F.Supp.2d at 375; *see also Roman Catholic Bishop of Springfield v. City of Springfield*, 760 F.Supp.2d 172, 188–89 (finding unequal terms claim fails as a matter of law where plaintiff "presented no evidence of unequal treatment as compared to *any* secular comparator, whether similarly situated or not."). The Eleventh Circuit has concluded that:

> A plaintiff bringing an as-applied Equal Terms challenge must present evidence that a similarly situated nonreligious comparator received differential treatment under the challenged regulation. If a plaintiff offers no similarly situated comparator, then there can be no cognizable evidence of less than equal treatment, and the plaintiff has failed to meet its initial burden of proof.

*Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County*, 450 F.3d 1295, 1311 (11th Cir.2006). As Plaintiff has not pointed to unequal treatment when compared to nonreligious entities, summary judgment is appropriate in Defendants' favor on this issue. *Id.*

### b. RLUIPA's Nondiscrimination Provision

 Under RLUIPA's nondiscrimination provision, governments are prevented from discriminating on the basis of "reli-

gion or religious denomination." 42 U.S.C. § 2000cc(b)(2). There are few published cases considering this provision of RLUIPA. The parties treat RLUIPA's nondiscrimination provision as a subset of the equal terms provision and assert that in order to make out a case of religious discrimination, Plaintiff must show that it was treated differently from a similarly situated religious organization. Plaintiff bears the initial burden of producing prima facie evidence to support a claim for violations of section (b) of RLUIPA. *Primera*, 450 F.3d at 1308 (citing 42 U.S.C. § 2000cc–2). Once the plaintiff meets its initial burden and produces prima facie evidence supporting such a claim, the government bears the burden of showing that its implementation of the land use regulation passes strict scrutiny—that is, the regulation "employs a narrowly tailored means of achieving a compelling government interest." *Covenant Christian Ministries, Inc. v. City of Marietta*, 654 F.3d 1231, 1245 (11th Cir.2011) (citing *Primera*, 450 F.3d at 1308).

As construed by the Eleventh Circuit, RLUIPA's nondiscrimination provision codifies the heightened strict scrutiny standard of constitutional review the Supreme Court applies in religious free exercise and nondiscrimination cases, while incorporating the Court's holding in *Employment Div., Dept. of Human Res. v. Smith*, 494 U.S. 872, 877, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), that strict scrutiny is inapplicable to "neutral laws of general applicability that incidentally burden religious exercise." *Midrash*, 366 F.3d at 1231–32 ("Congress enshrined similar nondiscrimination principles in § (b)'s requirement that religious and nonreligious assemblies or institutions be treated equally."); *see also Primera*, 450 F.3d at 1313 (finding equal terms violation comparable to equal protection claim); *Hollywood Community Synagogue, Inc.*, 430 F.Supp.2d at 1311 (applying selective enforcement analysis to

plaintiff's claim under RLUIPA's nondiscrimination provision); *West Pikeland*, 721 F.Supp.2d at 382–84 (applying equal protection analysis to RLUIPA nondiscrimination claim).

■ The Eleventh Circuit has identified three distinct kinds of statutory equal protection/nondiscrimination violations: (1) a statute that facially differentiates between religious assemblies or institutions;[31] (2) a facially neutral statute that is nevertheless "gerrymandered" to place a burden solely on a particular religious assembly or institution; or (3) a truly neutral statute that is selectively enforced against one religious denomination as opposed to another. *Primera*, 450 F.3d at 1308. Plaintiff does not assert that the Zoning Ordinance facially differentiates between religious assemblies on the basis of denomination. Rather, Plaintiff asserts that the City has engaged in "religious gerrymandering" and selective enforcement of its parking requirements. (Pl.'s Resp. Summ. J. at 14; Pl.'s Br. Summ J. at 27–28.)

■ A religious gerrymander that departs from basic principles of neutrality may support a RLUIPA violation. *Id.* at 1309 (citing *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (holding that drafting of an otherwise facially neutral classification essentially constituted a religious "gerrymander" that departed from principles of neutrality because it revealed that the ordinances "had as their object the suppression of religion.")). To prove this kind of statutory violation, Plaintiff would have to show that the Parking Ordinance separates permissible from impermissible assemblies or institutions in a way that

burdens "almost only" religious uses. *Id.* Plaintiff has presented no such evidence to the Court. Rather, Plaintiff's argument is that by ignoring the definition of "church" in its Ordinance and then ignoring the evidence provided by Plaintiff in its parking studies, the City engaged in the "kind of result oriented religious gerrymandering" prohibited under RLUIPA. (Pl.'s Resp. Summ. J. at 13–14.) The Court's review of the Ordinance reveals that it was not "gerrymandered" to burden only religious uses such as Plaintiff's. In fact, the Ordinance was enacted before Plaintiff purchased the property, undermining any suggestion that the Ordinance targeted Plaintiff's non-traditional religious denomination. *Id.* at 1310.

■ Plaintiff's claim is more appropriately couched as an "as-applied challenge" to the Parking Ordinance. The application of a neutral ordinance may violate RLUIPA's nondiscrimination provision if it differentially treats similarly situated religious assemblies on the basis of denomination. *See Primera*, 450 F.3d at 1311 (citing *Konikov v. Orange County, Fla.*, 410 F.3d 1317, 1327–29 (11th Cir.2005)) (in the context of an equal terms violation). To prevail on a claim that the City's Ordinance was applied to Plaintiff, and not other religious assemblies or institutions (basically a selective enforcement claim), Plaintiff must show: (1) that it was treated differently from other similarly situated religious assemblies or institutions, and (2) that the City unequally applied a facially neutral ordinance for the purpose of discriminating against Plaintiff. *Campbell v. Rainbow City*, 434 F.3d 1306, 1314 (11th Cir.2006) (citing *Strickland v. Alderman*, 74 F.3d 260, 264 (11th Cir.1996)). These

---

**31.** The Zoning Ordinance does not treat religious uses differently from secular uses. The parking requirements are imposed on all secular as well as religious uses. Facially, there is no evidence that the City's Ordinance treats religious and secular uses differently. Rather, the Ordinance appears to treat large and small scale uses differently, but this difference in treatment does not amount to discrimination.

issues must be determined by the factfinder unless, as a matter of law, Plaintiff puts forth insufficient evidence of discrimination to create a triable issue of fact on the issue. *See Wright v. Southland Corp.*, 187 F.3d 1287, 1301–02 (11th Cir.1999) ("The Supreme Court has stated that courts should not 'treat discrimination differently from other ultimate questions of fact.' "); *Campbell*, 434 F.3d at 1314–16; *Primera*, 450 F.3d at 1313–14; *West Pikeland*, 721 F.Supp.2d at 385–86.

### i. Whether Plaintiff Identified Similarly Situated Comparators

 In the zoning context, a showing that two projects were similarly situated requires some specificity. *Campbell*, 434 F.3d at 1314 (citing *Racine Charter One, Inc. v. Racine Unified School Dist.*, 424 F.3d 677, 680 (7th Cir.2005)). The Eleventh Circuit has held that in order for any religious assembly or institution to be similarly situated to Plaintiff, it must be prima facie identical in all relevant respects. *Id.* at 1315.

---

**32.** Plaintiff provided specific details only as to the alleged similarity of four of these other religious assemblies. (*See* Pl.'s Br. Summ. J. at 17–24.) Therefore, under *Campbell*, the Court cannot determine whether these other religious assemblies or institutions were sufficient comparators.

**33.** In its motion for reconsideration, Plaintiff objects to the Court's reliance on the City's application of the multi-use formula under Section 18.2.1 of the Ordinance as the correct parking standard applied to Plaintiff's Application because the City ultimately calculated an alternative parking ratio based on Plaintiff's Parking Studies. However, these facts were acknowledged by the Court in both the Order's Background section and the Court's analysis of whether the City had engaged in an individualized assessment under RLUIPA. Plaintiff argues that the City abandoned its application of the multi-use formula. On the other hand, the City argues that it never abandoned the multi-use formula under Section

The crux of Plaintiff's Complaint in this matter is that

> The City has discriminated against the Church, not only by refusing to apply its own parking ordinance to the Church, but also by applying a different parking standard than it has applied to every other church or place of worship in its jurisdictional boundaries. The City approved parking variances to reduce the required parking required for other places of worship in the City, while imposing a parking requirement on the Church of Scientology that amounts to almost three (3) times the parking required by the City's Zoning Ordinance.

(Pl.'s Br. Summ. J. at 27–28.) Plaintiff identified eleven religious assemblies in the City Plaintiff contends were treated more favorably than Plaintiff in terms of how the Parking Ordinance was applied.[32] (PSMF ¶ 81.) Neither party disputes that the "parking standard" initially applied to Plaintiff was the multi-use formula under Section 18.2.1 of the Ordinance rather than the "church use standard."[33]

---

18.2.1 of the Zoning Ordinance, rather the City reevaluated and revised its parking calculation based on specific data voluntarily provided by Plaintiff. It is clear from the record that the City determined that the "church use" parking standard did not apply to Plaintiff's proposed use of the property. Instead the City determined that the multi-use parking standard under Section 18.2.1 of the Ordinance—which requires that parking is calculated based on the proportion that each use contributes to the total—should apply to Plaintiff's Application. After Plaintiff requested and obtained a deferral of its Application to allow time to provide the staff with a parking study showing the present and future parking needs for the Church, the City revised its parking calculation to reduce the number of parking spaces required for Plaintiff's property. However, the crux of Plaintiff's Complaint is not the City's revised parking calculation, rather the crux of Plaintiff's Complaint is that the City did not apply the "church use" parking standard to calculate

Plaintiff misconstrues the appropriate inquiry into whether other religious assemblies or institutions are similarly situated by pointing to all religious institutions that received approval by the City since 2005. "In any type of zoning situation, the use of the proposed development is quite relevant." *Campbell*, 434 F.3d at 1314–15 (noting that the district court correctly recognized the importance of use in its determination that only developers who sought approval of apartment building plans could be considered similarly situated and finding that it would have been error for the district court to consider commercial developments to be similarly situated to the plaintiff's large residential complex). Plaintiff wants the definition of a "church or other place of worship" to apply to its proposed use for purposes of calculating the required parking for the site. The Zoning Ordinance defines church as "a facility in which persons regularly assemble for religious ceremonies. This shall include, on the same lot, accessory structures and uses such as minister's and caretaker's residences, and other uses identified under the provisions for Administrative and Use Permits." (Zoning Ordinance § 18.2.1(C).) The property is zoned O–I (Office Institutional) which defines "accessory uses" as "structures and land [that] may be used for uses customarily incidental to any permitted use." (*Id.* at § 8.1.2(B).)

During the November 19, 2009, Planning Commission meeting, counsel for Plaintiff stated "they have a chapel service that occurs on the weekend. And that is where they come together for chapel. It is not like a congregational style church like you may be accustomed to that everybody turns out at the same time every week for one particular hour or a series of several hours. They don't typically do that … the general use of the building will be the

offices, for counseling and classroom study." (Tr. Nov. 19, 2009, Planning Commission Meeting, Doc. 46–1 at 33:16–22.) In addition, Plaintiff's counsel represented to the City Council at the December 15, 2009, rezoning hearing that "it's not a congregational style of worship like you're used to. It is a lot of independent study. It is a lot of counseling, that type of thing." (Tr. Dec. 15, 2009, Hearing 48:7–10, Doc. 47–1.) Indeed, Ms. Danos, Plaintiff's President, testified that the average attendance at the Church of Scientology's Sunday worship service is between 8 to 10 people. (Danos Dep. 45:24–46:4.)

Although Plaintiff quibbles over whether the Zoning Ordinance requires congregational style worship for a facility to qualify as a church, it is clear from these representations as well as the evidence submitted on summary judgment that Plaintiff's use of the facility as a place for persons to regularly assemble for religious ceremonies is only one of the primary uses of the facility as contemplated by the Zoning Ordinance. Plaintiff's proposed use of the property has three primary components: (1) Auditing and Training classrooms; (2) office space; and (3) a chapel/sanctuary. According to the Staff Reports, the floor plan called for 11,153 square feet of classroom space, 17,065 square feet of office space and 1,218 square feet of chapel/sanctuary space. (Doc. 88–5 at 9; *see also* Leathers Dep., Ex. 20 at 9.) Plaintiff scoffs at the City's assumption that a church is an "assembly type use for large congregational religious worship services." The Merriam–Webster Collegiate Dictionary (11th ed.2009) defines "congregation" as "an assembly of persons." Because the parking requirement for a church is based on the square footage of the largest assembly area, the City's statement that the definition "assumes [the primary use] is an assembly-type use for large congregational

the necessary parking based on the largest assembly area.

religious worship services" is reasonable. Moreover, the City's decision is fully supported by the express language of the Ordinance requiring that the City calculate parking "based on the proportion that each use contributes to the total."

The City does not deny that Plaintiff is a church or will use part of the property for religious ceremonies. The City simply determined that Plaintiff will not use the property primarily for large congregational services in accordance with how the parking requirements were designed. By Plaintiff's own admission, congregational worship service is not a core religious practice of Scientology. The core religious services of Scientology are "Training" and "Auditing." [34] These practices, while constituting religious exercise, are not assembly type uses as contemplated by the parking provision of the Ordinance. This is not to say that Plaintiff is not a church and does not regularly assemble for purposes of religious ceremony so as to constitute a church under the Zoning Ordinance. Indeed, the Court does not find as a matter of law, as Plaintiff suggests in its motion for reconsideration, that Plaintiff is not a church under the City's Zoning Ordinance. Obviously, Plaintiff is a church and the subject property has been rezoned to allow its use as a church by Plaintiff.[35]

Accordingly, in order for Plaintiff's comparators to be similarly situated, they must have sought rezoning approval for a primary use in addition to their "church" use (defined by the Zoning Ordinance as an "assembly-type use"), that would necessitate application of the considerations of section 18.2.1. Defendant identified two examples where other religious institutions were determined by the City as not falling solely under the Zoning Ordinance's definition of "church" for purposes of applying the Parking Ordinance. (Defs.' Resp. SMF ¶ 82.)

*Kadampa Mediation Center*

■■■ For instance, in the case of the Kadampa Meditation Center (hereinafter "Kadampa"), Kadampa applied to rezone property from O–I conditional "to allow for a Place of Worship, having accessory uses, and to allow for a boarding house, all to operate within an existing 7,430 square foot building." (Leathers Dep., Ex. 31, Doc. 40–1.) In calculating the parking requirement for Kadampa, the City applied a multi-use formula that totaled the amount of parking required for Kadampa's sanctuary (the "church" use) and boarding facility (the "boarding house" use). (Defs.' Resp. SMF ¶ 82; Leathers Dep. 164:14– 167:15, Doc. 41 at 8–14.)

---

34. Plaintiff contends in its motion for reconsideration that Training and Auditing "typically involve participation of parishioners and Church staff who assemble to participate in Scientology and religious education and ceremonies." However, Training and Auditing are not conducted in a single large assembly area. Rather, Plaintiff's floor plans provide for 17 course rooms and 28 offices for the Training and 20 counseling rooms for the Auditing. (Danos Dep., Ex. 4.) Indeed, on summary judgment Plaintiff represented that "Auditing is ministered at Scientology churches in confidential one-on-one sessions between a parishioner and a specially trained individual called an Auditor. Auditing must be provided in quiet and confidential surroundings, away from other activities that

may be going on in a church." (Pl.'s Br. Summ. J. 5.) In addition, Plaintiff's President testified that the theory course rooms are set up for independent study. (Danos Dep. 70.) Therefore, the Court finds that Plaintiff's representation in its motion for reconsideration that the Training and Auditing are assembly type uses is an artful re-fashioning of the evidence before the Court and not completely accurate.

35. In fact, the Property's prior zoning classification was conditioned on its use for office and accessory uses preventing its use as a church without a rezoning. The City granted Plaintiff's request to rezone the property for use as a church on December 15, 2009.

The City did not require separate parking for classrooms or offices because the boarding house and sanctuary accounted for the majority of the square footage of the building and "if the remaining space is relatively minor, it would be accessory and wouldn't be separately calculated." (Leathers Dep. 167:3–168:17) ("When ... the accessory uses become larger is when we would separately calculate them.") The City did not consider the boarding house to be an accessory use, but rather considered it to be a parallel primary use that required separate parking in addition to the sanctuary. As the Director testified, the boarding house is "something which is being done in conjunction with this church, but it is not, it is significant enough so that it is, and it is not what would be normally—most churches don't have this kind of facility. And so the parking ordinance [as applied to churches] really doesn't contemplate that kind of use at that location. And so it was separately addressed in part." (Leathers Dep. 172:17–173:7.) Accordingly, the Court finds that while Kadampa is an appropriate comparator, it was treated no more favorably than Plaintiff. Therefore, evidence relating to Kadampa's treatment does not support Plaintiff's claim that the City violated RLUIPA's nondiscrimination provision.

### Beth Tefillah

Similarly, in the case of the Congregation Beth Tefillah, although certain accommodations were made with regard to the total number of on-site parking spaces required, the City applied a multi-use formula to calculate the parking required for Beth Tefillah's synagogue and proposed preschool. (Defs.' Resp. SMF ¶ 82; Leathers Dep. 196:6–201:9.) Based on the multi-use formula, the City determined 76 parking spaces were required for the church use and 29 parking spaces were required for the preschool use for a total of 105 parking spaces required for the property. (Leathers Dep. 199:7–17.) The property had 71 onsite parking spaces available, leaving a deficit of 34 parking spaces. (Leathers Dep. 197:1–198:6.)

Section 18.2.2 of the City's Parking Ordinance allows for shared on-site parking between multiple uses on the same property. (Zoning Ordinance § 18.2.2; Leathers Dep. 200:22–24.) Section 18.2.2 allows churches to share up to 50% of their total parking with other uses on the property under certain conditions. (Zoning Ordinance § 18.2.2; Leathers Dep. 198:8–14.) In the case of Beth Tefillah, the City applied the shared on-site parking provision of section 18.2.2 to allow the synagogue and the preschool to share 38 of the 71 onsite spaces between them and to reduce the total number of parking spaces required to 77. (Leathers Dep. 196:6–201:9.) The application of the on-site parking provision to Beth Tefillah's application left a deficit of 6 parking spaces. (Leathers Dep. 199:7–20.)

Section 19.3.6 of the City's Zoning Ordinance provides that when parking under Section 18.2.1 cannot be satisfied, off-site shared parking may be allowed as long as no more than 20% of the shared parking is located off-site and the off-site location is no more than 300 feet from the principal use. (Zoning Ordinance § 19.3.6.) The City permitted Beth Tefillah to meet its remaining parking needs through an off-site shared parking arrangement with a nearby school. (Leathers Dep. 196:6–201:9; PSMF ¶ 97.) Plaintiff asserts and Defendant acknowledges that a variance should have been required for approval of Beth Tefillah's shared off-site parking arrangement for an additional 6 required parking spaces. (*See also* Leathers Dep. 199:25–200:25) (stating that in addition to a variance, an administrative permit would also have been necessary to approve Beth Tefillah's off-site parking arrangement un-

der the requirements of the Zoning Ordinance). Plaintiff contends that by failing to require Beth Tefillah to obtain a variance in approving its use permit as was required under the Zoning Ordinance, the City gave favorable treatment to Beth Tefillah.

The City argues that unlike Beth Tefillah, Plaintiff did not propose a shared parking arrangement that would have allowed it to reduce the total number of required on-site parking spaces. However, the record demonstrates that while Beth Tefillah produced documentation of its off-site shared parking arrangement, there is no evidence in the record that Beth Tefillah similarly sought approval of an on-site shared parking arrangement. (Leathers Dep. 199:20–24; PSMF ¶ 97.) Although it is not entirely clear from the limited record presented by the parties on this issue, it appears that the City may have automatically applied the on-site parking provision without any express request by Beth Tefillah. While it is evident from the initial Staff Report that Beth Tefillah proposed to meet its parking deficit through an off-site shared parking arrangement, it is also possible that the on-site parking arrangement was discussed during subsequent portions of the zoning process.

The record demonstrates that Plaintiff was in the same position as Beth Tefillah

in terms of potentially utilizing a shared parking arrangement to satisfy its parking deficit. Construing the facts and inferences in the light most favorable to Plaintiff, it appears that the City put the burden on Plaintiff to request a variance and demonstrate a reduction in required parking through an appropriate shared parking arrangement, and thereby treated Plaintiff less favorably than it did Beth Tefillah.[36] (Leathers Dep., Ex. 20 at 13; Leathers Dep., Ex. 21 at 12.) There is no evidence in the record that Plaintiff attempted to demonstrate the appropriateness of an on-site shared parking arrangement to meet the City's parking requirement. Rather, it appears that Plaintiff remained wedded to its assertion that it should be required to provide only 41 parking spaces.[37]

Accordingly, construing the evidence in the light most favorable to Plaintiff on this issue, the Court finds there are genuine issues of material fact as to whether Beth Tefillah, a similarly situated comparator, was treated more favorably than Plaintiff. The City's application of a shared parking analysis to Beth Tefillah's proposed expansion allowing the two primary on-site uses to share parking, an analysis that was not done in consideration of Plaintiff's Application, creates an issue of fact as to whether the City treated Beth Tefillah more favorably than Plaintiff.[38]

36. The Court notes that the City's staff recommended to the Planning Commission that "the total building area be limited to 32,053 square feet unless [Plaintiff] receives a variance from the minimum parking requirements or can demonstrate a reduction is warranted due to the operation of [sic] use such that parking spaces could be shared." (Leathers Dep., Ex. 20 at 13; Leathers Dep., Ex. 21 at 12.)

37. Plaintiff did undertake a Parking Study designed to show that the Church's peak usage was much lower than the City's parking calculation. However the Parking Study was

only one out of the three possibilities recommended by the staff as a potential method to alleviate the City's parking demand. Although Plaintiff sought a variance from the parking requirement in its original zoning application as discussed earlier, it appears Plaintiff did not resubmit its variance request as suggested by the Staff once they engaged in a more in-depth analysis and presentation of the rezoning request for the Planning Commission and City Council.

38. The Court notes that the distinction between Beth Tefillah and Plaintiff is slim and

*Lutheran Church of the Apostles*

█ In a third case, Lutheran Church of the Apostles (hereinafter "Lutheran"), the Director testified that the City calculated the required parking for the construction of an 8,770 square foot "Family Life Center" (the "church" use) in addition to the required parking for an existing daycare facility (the "non-church" use).[39]

(Leathers Dep. 179:24–188:11.) According to the Director, because the daycare is not a normal part of the church facility but is a separate parallel operation, the parking for the daycare facility was separately calculated. (Leathers Dep. 184:20–186:5.) The Director further testified that the church and the daycare facility were able to operate under an on-site shared parking arrangement whereby 50 percent of the

---

may ultimately prove only to be different treatment but not unequal treatment.

**39.** In the September 30, 2011, Order, the Court found that Plaintiff failed to provide the Court with an adequate record of Lutheran's zoning application as required for the Court to determine whether Lutheran is a similarly situated comparator. (Doc. 86 at 63, *citing Campbell v. Rainbow City*, 434 F.3d 1306, 1315 (11th Cir.2006).) In support of its argument with respect to Lutheran, Plaintiff cited to "Ex. G, Leathers Depo." and "Ex. 35 to Ex. "G." " (*See* Pl.'s SMF ¶¶ 82–93, Doc. 37–4.) Plaintiff's Exhibit "G" contains excerpts from the October 14, 2010, Deposition of Nancy Leathers. (*See* Doc. 39–4.) Plaintiff attached 2 pages as "Deposition Exhibit No. 35" to Exhibit "G": (1) the first page from the staff report and (2) the Letter of Intent regarding the proposed project from Lutheran's engineer. (*See* Ex. G–4, Doc. 40–2.) In its motion for reconsideration, Plaintiff asserts that the Court erred by failing to consider the staff reports for both the Planning Commission and City Council hearings for the Lutheran Church submitted by Plaintiff in their entirety at Doc. 42–9 and 42–10. Once again Plaintiff has erroneously cited to the record. Docket 42 contains only 3 attachments (thus ending at Doc. 42–3) and does not contain any staff reports for the Lutheran Church as represented by Plaintiff. On summary judgment, "[t]he moving party bears 'the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.' " *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259 (11th Cir.2004) (*quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotations omitted)); *see also* LR 56.1(B)(1), NDGa. The Court is not required to scour the record in search of evidence supporting the movant's case. That is the job of Plaintiff's counsel. *See United States v. Adkinson*, 135 F.3d 1363, 1378–1380 (11th Cir.1998); *Johnson v. City of Ft. Lauderdale*, 126 F.3d 1372, 1373 (11th Cir.1997); *Dickson v. Amoco Performance Prods., Inc.*, 845 F.Supp. 1565, 1570 (N.D.Ga.1994) (Hall, J.) ("It should be a party's responsibility to direct the court's attention separately to each portion of the record which supports each of the party's distinct arguments."); *Reese v. Herbert*, 527 F.3d at 1268–69 ("the movant is not 'absolve[d] ... of the burden of showing that it is entitled to judgment as a matter of law, and a Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record.' "). Local Rule 56.1 protects judicial resources by "mak[ing] the parties organize the evidence rather than leaving the burden upon the district judge." *Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir.2008) (*quoting Alsina–Ortiz v. Laboy*, 400 F.3d 77, 80 (1st Cir.2005)) (referring to analogous local rule); *see also Libel v. Adventure Lands of America, Inc.*, 482 F.3d 1028, 1032 (8th Cir.2007) ("Courts have neither the duty nor the time to investigate the record in search of an unidentified genuine issue of material fact to support a claim or defense."). However, after culling through the record, the Court has now found additional documents regarding Lutheran's application for a use permit for its 8,770 square foot addition to the existing 19,552 square foot church. (*See* Doc. 41–7 through 41–10.) On a final note, Plaintiff repeatedly used incorrect record citations throughout its motion for reconsideration making the Court's job extremely difficult and tedious. Plaintiff should strive to be more careful in providing accurate citations to the record in the future so as to aid the Court in its determination of the merits of the case before it.

parking spaces of the church may be shared with the daycare. (Leathers Dep. 180:21–181:12; 184:25–185:2.) Plaintiff asserts that by misapplying the church parking standard, Lutheran was treated more favorably than Plaintiff.

Lutheran submitted a Letter of Intent in support of its Use Permit Application stating that "additional parking is proposed to provide code compliance 129 spaces [sic] for the potential 450 fixed seats, as these will be in place 95% of the time." (Doc. 41–10 at 18.) Lutheran also originally sought six concurrent variances, including a variance "to reduce the required parking from 216 to 129 (article 18.2.1.) The proposed sanctuary is designed with 450 seats that would accommodate worship services as well as musical or theater events. The Off Street Parking article requires one parking space per 3.5 seats, resulting in our 129 spaces. The structure is also designed to accommodate a basketball court, and thus the seating must be removable. In this case the article requires one space per 30 square feet of space (including the chancel) which results in 216 spaces." (*Id.* at 19.) Neither the staff report for the Planning Commission hearing nor the staff report for the City Council hearing mention or discuss Lutheran's request for a variance to reduce the required number of parking spaces or a parking calculation based square footage rather than the number of fixed seats in the assembly area. (*See* Docs. 41–8 and 41–10.) However, the staff report prepared for the City Council indicates that the Planning Commission "had a concern that the church would not have enough parking even though they meet the minimum parking requirements." (Doc. 41–10 at 6.)

Plaintiff contends that the City treated Lutheran more favorably than Plaintiff essentially by applying a parking standard that allowed Lutheran less parking spaces than Plaintiff believes were required under the Parking Ordinance. According to Plaintiff, the City applied the fixed seat church parking standard (1 parking space for every 3.5 seats in the largest assembly area with fixed seats) as opposed to the per square foot church parking standard (1 parking space for every 30 square feet of floor area in the largest assembly area without fixed seats) when it granted Lutheran a use permit for its 8,770 square foot addition to its existing 19,552 square foot church.

The Director testified that the City calculated the required parking for the construction of an 8,770 square foot "Family Life Center" (the "church" use) in addition to the required parking for an existing daycare facility (the "non-church" use). (Leathers Dep. 179:24–188:11.) The parking for the church use was calculated using the fixed seat church parking standard of 1 parking space per 3.5 seats in the largest assembly area. (*Id.*) According to the Director, because the daycare is not a normal part of the church facility but is a separate parallel operation, the parking for the daycare facility was separately calculated. (Leathers Dep. 184:20–186:5.)

Plaintiff appears to dispute the proposition that the City applied a multiuse parking formula to Lutheran in its motion for reconsideration, contending that the staff reports "clearly show that the City considered only the additional new sanctuary in determining the parking requirement for the Lutheran Church." However, the Director acknowledged during her deposition that the staff reports do not discuss the separate parking calculation performed for the daycare.

Q: So the City applied, the City assumed that the seating in the 8,770 square foot sanctuary was going to be 450 fixed seats and applied the

zoning ordinance requirement to that sanctuary, correct?

A: That's correct.

Q: And there may or may not be a separate calculation for the day-care center?

A: There was a separate calculation. It's not in the staff analysis, but there was a separate calculation.

(Leathers Dep. 188:2–11, Doc. 41.) Although Plaintiff has offered nothing to rebut this testimony of the Director, the fact that the staff report does not address the daycare facility parking makes, at minimum, some dispute as to whether the City applied the multi-use parking formula to Lutheran's application such that it is a sufficient comparator for Plaintiff' discrimination claim.

The Director further testified that the church and the daycare facility were able to operate under an on-site shared parking arrangement whereby 50 percent of the parking spaces of the church may be shared with the daycare. (Leathers Dep. 180:21–181:12; 184:25–185:2.) Consequently, no additional parking spaces beyond those required for the church use were required for the site. (Leathers Dep. 188:12–15, Doc. 41.) It appears that the City allowed Lutheran to take advantage of a shared parking arrangement allowing the two primary uses to share parking. It is not apparent from the record whether Lutheran made a request for such an arrangement. On the other hand, in its consideration of Plaintiff's Application, the City put the onus on Plaintiff to demonstrate that "a reduction in parking was warranted due to the operation of [sic] use such that parking spaces could be shared." (May 21, 2009, Staff Report at 13, Doc. 88–4.)

In addition, Plaintiff asserts that by calculating the required parking for the church use based on the number of fixed seats, Lutheran was treated favor-ably than Plaintiff. As noted above, the parking requirements for churches are based either on the number of fixed seats in the largest assembly area or based on the gross square footage of the largest assembly area if no fixed seats are designated. (Zoning Ordinance § 18.2.1.) In her deposition, the Director testified that "fixed does not mean it's affixed to the ground and can't be moved. I think I said that in the beginning. . . . [F]ixed contemplates that's the maximum number that you will have in there at any time and it can be calculated." (Leathers Dep. 183:17–184:6.) Plaintiff contends that the City should have applied the "per square foot" parking standard as opposed to the "fixed seat" parking standard because Lutheran planned for the seats to be in place only 95% of the time and thus the seats are not fixed. According to Plaintiff, if the City had applied the per square foot parking standard, 293 parking spaces would have been required as opposed to the 129 spaces actually required by the City. Plaintiff's interpretation is arguably supported to some extent by Lutheran's own Letter of Intent requesting a variance in the event the City determined that the parking would be calculated based on the square footage of the assembly area because the seats were in fact removable. However, the Director testified that the use of the fixed seat parking standard for Lutheran was appropriate where the seats are "fixed in place almost all of the time and there's only one configuration that works for the 450. And so they maxed out the number of, the number of seats that can go into the room." (Leathers Dep. 182:23–183:5, Doc. 41.) Accordingly, while the evidence of disparate treatment may ultimately prove marginal or meaningless, the Court finds that there are genuine issues of fact regarding whether Lutheran was treated more favorably by the City based on its application of a shared park-

ing arrangement and the fixed seat church parking standard for the church use.

*Zainabia Islamic Education Center*

 Finally, Plaintiff points out as a comparator the case of Zainabia Islamic Education Center ("Zainabia") where the City approved a variance to reduce the parking requirement. (*See* Pl.'s Br. Summ. J. at 22–23; Leathers Dep., Ex. 45, Doc. 40–4.) However, it is undisputed that Plaintiff withdrew its initial request for a concurrent variance from the parking requirement and did not renew it. As the Eleventh Circuit recognized in *Primera*, a rezoning and a variance are markedly different forms of zoning relief and have plainly different purposes. *Primera*, 450 F.3d at 1311. A variance alleviates a particular landowner's hardship but does not alter the property's zoning classification. Therefore, a variance merely grants the present owner a right to deviate from the general rule. *Id.* at 1311. "By contrast, rezoning is not meant to alleviate a particular landowner's hardship; rather, it is a general adjustment of the zoning scheme that affects the rights of all future landowners." *Id.* Under these facts, the Court in *Primera* found that the plaintiff failed to present evidence of a similarly situated comparator. *Id.* at 1313 ("projects which seek different types of variances are not similarly situated"). The Court went on to hold that Primera failed to establish a prima facie case of discrimination because:

> [Primera] introduced no evidence that the County applied the BCZC in a manner that subtly or covertly departed from requirements of neutrality and general applicability. The evidence Primera adduced regarding its treatment and the School's treatment is consistent with the County's neutral application of different zoning regulations. Primera's evidence establishes only that the School received *different* treatment, not *unequal* treatment.

*Id.* (internal citations omitted). Thus, because Zainabia sought and obtained a variance as opposed to a rezoning, the Court finds that Zainabia is not a similarly situated comparator.

Construing these facts in the light most favorable to Plaintiff, the Court finds there are genuine issues of material fact regarding whether the City treated Beth Tefillah and Lutheran more favorably than Plaintiff. The Court now turns to whether the City acted with a discriminatory purpose.

### ii. Whether the City Acted With a Discriminatory Purpose

 In order to make out a prima facie case of discrimination under Section (b) of RLUIPA, Plaintiff must present evidence of intentional or purposeful discrimination by the City because of Plaintiff's religious denomination. *See Covenant Christian Ministries, Inc. v. City of Marietta*, 2008 U.S. Dist. LEXIS 54304, at *46–47 (N.D.Ga. Mar. 31, 2008), *aff'd* 654 F.3d 1231 (11th Cir.2011); *Roman Catholic Bishop of Springfield v. City of Springfield*, 760 F.Supp.2d 172, 191 (D.Mass. 2011); *Denver First Church of the Nazarene v. Cherry Hills Village*, 2006 U.S. Dist. LEXIS 49483, at *9 (D.Colo. July 19, 2006) (citing *Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 900 (7th Cir. 2005)); *West Pikeland*, 721 F.Supp.2d at 377–381; *Reaching Hearts Int'l, Inc.*, 584 F.Supp.2d at 781. *See also Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (holding that proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause); *Jean v. Nelson*, 711 F.2d 1455, 1483 (11th Cir.1983) (reiterating Supreme Court's holding that plaintiffs challenging an action as discriminatory must go further than identifying a disparate impact and

prove the challenged action was the product of discriminatory intent); *E & T Realty v. Strickland,* 830 F.2d 1107, 1114 (11th Cir.1987) ("Even arbitrary administration of a statute, without purposeful discrimination, does not violate the equal protection clause."). Recognizing in the land use context that legislative and administrative actions are rarely motivated by one purpose only, the Supreme Court in *Arlington Heights* held that a plaintiff must establish that the challenged decision was at least motivated in part by a discriminatory purpose but not that it was the primary, or dominant purpose. 429 U.S. at 266, 97 S.Ct. 555.

 A plaintiff may either show intentional discrimination through direct evidence or establish an inference of discrimination through circumstantial evidence. *See, e.g., Covenant Christian Ministries, Inc.,* 2008 U.S. Dist. LEXIS 54304, at *46–47; *Reaching Hearts Int'l, Inc.,* 584 F.Supp.2d at 781–82. "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights,* 429 U.S. at 265, 97 S.Ct. 555. Only the most blatant remarks, the intent of which could be nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination. *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1086 (11th Cir.2004) (discussing employment discrimination). Comments or conduct falling short of this mark may be relevant circumstantial evidence. *Id.*

Because the very nature of legislative and administrative action makes it difficult to ascertain the intent of the acting body, the Eleventh Circuit has recognized several factors that are probative of whether a decision-making body was motivated by discriminatory intent. *Jean v. Nelson,* 711 F.2d at 1486. First, evidence of the "impact" of the legislative/administrative decision, i.e. whether it "bears more heavily on one [religion] than another," alone may demonstrate the existence of a consistent pattern of discriminatory action by the decision-making body. *Id. (citing Arlington Heights,* 429 U.S. at 266, 97 S.Ct. 555). However, in cases where proof of impact alone is insufficient, where a stark pattern of discrimination is not evident, the courts should consider the following types of circumstantial evidence: (1) historical background of the decision, particularly if it reveals a series of official actions taken for invidious purposes, (2) the specific sequence of events leading up to the challenged decision, (3) departures from the normal procedural sequence, as well as substantive departures, (4) legislative or administrative history, especially where there are contemporary statements by members of the decision-making body, minutes of its meetings, or reports, (5) foreseeability of discriminatory impact, (6) knowledge of discriminatory impact, and (7) the availability of less discriminatory alternatives. *Id.* at 1485–86; *Arlington Heights,* 429 U.S. at 265–66, 97 S.Ct. 555; *see also Reaching Hearts Int'l, Inc.,* 584 F.Supp.2d at 781 (evaluating religious discrimination claim under equal protection clause and RLUIPA in land use context).

While it is rare for a government to expressly offer religion as its reason to exclude a church, and discrimination may often lurk behind universally acceptable reasons such as traffic, it is also true that "zoning laws inherently distinguish between uses and necessarily involve selection and categorization, often restricting religious assemblies." *Midrash,* 366 F.3d at 1234 (citing *Lukumi,* 508 U.S. at 542–43, 113 S.Ct. 2217). "All laws are selective to some extent ... [but] inequality results when a legislature decides that the governmental interests it seeks to advance are worthy of being pursued only against con-

duct with a religious motivation." *Id.* The City's Zoning Ordinance does not facially prohibit or discriminate against churches or religious institutions. Indeed, a church is a permitted use in the O–I zoning district, along with other secular uses. The issue here is the City's application of the Parking Ordinance to Plaintiff's property.

In the September 30, 2011, Order, the Court granted summary judgment in favor of the City on Plaintiff's nondiscrimination claim under section (b)(2) of RLUIPA finding that:

> [t]he record here does not support a reasonable inference, much less a conclusion, that the City intentionally discriminated against Plaintiff on the basis of religion as a matter of law. Plaintiff has presented no direct evidence of discrimination. Nor can discrimination be inferred merely because Plaintiff was treated differently than other churches in terms of calculating its required parking where 'as long as restrictions or distinctions are unrelated to the religious characterization, RLUIPA is not implicated.'

(Doc. 86 at 67 (*citing Midrash,* 366 F.3d at 1234 n. 17).) Plaintiff's arguments on summary judgment addressed only its alleged different treatment from other similarly situated comparators and completely failed to address the separate requirement that Plaintiff establish that the City's action was motivated by a discriminatory purpose. Indeed, it is well-established that a plaintiff challenging an action as discriminatory must go further than identifying disparate treatment and prove that the decision-making body acted with discriminatory intent. *Arlington Heights,* 429 U.S. at 265, 97 S.Ct. 555; *Jean v. Nelson,* 711 F.2d at 1483.

Plaintiff asserts that "evidence of discrimination can be inferred from the circumstances and the manner in which the Church's application was handled by the City" and from "the negative tenor" of the questions and statements made by two Council members at the December 15, 2009, hearing.[40] In Plaintiff's briefing of the motion for summary judgment, Plaintiff made no mention of the council member's statements and essentially assumed that the alleged different results of the zoning and variance process for identified churches *ipso facto* constituted proof of discriminatory intent. Plaintiff now asserts, more clearly than it attempted to imply on summary judgment, that the City employed a more extensive and intensive approval process to Plaintiff than to Beth Tefillah and Lutheran. Such evidence, if supported by the record, would give rise to a possible inference of discrimination and thus, a genuine issue of material fact as to whether the City discriminated against Plaintiff because of its religious denomination. *See West Pikeland,* 721 F.Supp.2d at 378; *Reaching Hearts Int'l,* 584 F.Supp.2d at 781–84 (upholding jury's verdict on religious discrimination claim and finding that evidence was sufficient to show that "discrimination was afoot").

Plaintiff presented evidence that its Application was subjected to a higher scrutiny and a lengthier approval process than other comparator churches. The Director testified that the typical zoning approval process takes 120 days from the filing of the application to the hearing before the Mayor and City Council. (Leathers Dep. Vol. I, 14:16–18:21.) Plaintiff's Application was delayed an additional five months beyond the 120 days typically required by

---

**40.** While the Plaintiff included the minutes of the city council's hearing in its exhibits attached to its motion for summary judgment, Plaintiff did not expressly identify *any* issues relating to the City Council's *discussion* of its rezoning application in its original motion briefing and statement of material facts in dispute.

the City for zoning approval. Plaintiff waited nine months from the submission of its Application in March 2009 for the City Council to take action at the December 15, 2009, hearing on its request to rezone the property for use as a church and its request to convert the basement into usable church space. (PSMF ¶ 47; Defs.' Resp. SMF ¶ 47; Dec. 15, 2009, City Council Minutes at 15–19, Doc. 48–1.) Plaintiff also submitted evidence that Beth Tefillah and Lutheran both received the benefit of a shared parking arrangement in order to reduce the required on-site parking under the City's Ordinance without undergoing the same repeated deferrals as Plaintiff before its request for expansion was denied based on a lack of adequate on-site parking. (*See supra* at 61–71.)

On the other hand, Defendant contends that the delay was the result of the City's efforts to find a solution to address the lack of sufficient parking for the larger square footage requested by Plaintiff. (Leathers Dep. Vol. I, 22:18–22.) Indeed, Defendant presented evidence that the City, at Plaintiff's request, considered two Parking Studies and developed an alternative parking ratio to reduce the number of parking spaces required based on these studies. (DSMF ¶ 40; Pl.'s Resp. SMF ¶ 40; DSMF ¶ 42; Pl.'s Resp. SMF ¶ 42.)

Further, Plaintiff presented evidence that in response to its original request for a variance from the City's parking requirement, the Church was informed that no variance was required because the Church had more than the required number of parking spaces under the Ordinance. (Doc. 88–3.) However, after relying on the City's representation that its Application met the City's parking requirement and withdrawing its request for a parking variance, Plaintiff was informed by the City that its on-site parking was deficient and its request for expansion was ultimately denied on that ground. (Doc. 88–5 at 8;

DSMF ¶¶ 27, 28; Pl.'s Resp. SMF ¶¶ 27, 28; Compl. ¶ 64; Dec. 15, 2009, City Council Minutes, Doc. 48–1 at 23–24.) A reasonable factfinder could find that the City's about-face regarding parking after learning of Plaintiff's non-traditional use of its property was motivated by discrimination on the basis of Plaintiff's religious denomination as opposed to a legitimate non-discriminatory concern by the City. *See Reaching Hearts Int'l,* 584 F.Supp.2d at 783 (finding a reasonable inference of discrimination was supported by the sequence of events leading up to the defendant's action which effectively foreclosed the plaintiff's ability to build a church on its property); *Arlington Heights,* 429 U.S. at 264–65, 97 S.Ct. 555 (explaining that the sequence of events or departures from the normal sequence might afford evidence that improper purposes are playing a role in a government's land use decisions). On the other hand, a reasonable factfinder could find that the City did not evidence any intent to discriminate, having properly flagged the parking issue once it formally evaluated the Plaintiff's entire rezoning application package for the Planning Commission and the City Council's review and approval. A variance still could have been sought once the parking issue had been identified. Similarly, a reasonable factfinder might find that the alleged differences in the three religious institution's treatment were insignificant and explained by legitimate, non-discriminatory reasons. *C.f., Jean v. Nelson,* 711 F.2d at 1486, n. 30.

The record shows that the City was aware that its decision to limit the square footage of the Property might foreclose Plaintiff's ability to adequately practice the Scientology religion in accordance with its religious scriptures. At the December 15, 2009, City Council hearing, counsel for Plaintiff argued:

The 32,000 square foot limitation would not work for the church. It does not

address their needs and the rights that they have to occupy the space and to use it for its intended purposes for their religious exercise and would hamper and greatly burden their ability to do that to the point where they cannot use the site. (Tr. Dec. 15, 2009 City Council Hearing at 31:5–13.) A reasonable factfinder could find that the City's conditional approval limiting the size of the Church to 32,000 square feet despite its knowledge, or at least the foreseeability, of the predictable effect on Plaintiff's effort to create and practice as the Ideal Organization, could support an inference of discriminatory intent. *See Jean v. Nelson*, 711 F.2d at 1486 (citing *Columbus Bd. of Ed. v. Penick*, 443 U.S. 449, 464–65, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979)).

Plaintiff also contends it made extraordinary efforts to allay the City's concerns regarding parking and modification of the existing building through alternate conditions which were rejected by the City based on an irrational fear of how to enforce the conditions. For example, it argues that it attempted to address the City's concern regarding the long range impact of Plaintiff's requested rezoning allowing a lower parking ratio than authorized under the Ordinance for such a high-density use—specifically, that approval of the rezoning would restrict future use of the property by a subsequent landowner. Plaintiff contends that it offered to place the property under a deed restriction providing that a future purchaser of the property would (1) have no vested right to utilize the parking ratio approved for the Church, (2) would be required to demonstrate compliance with the City's parking requirements, or (3) be required to demolish and reconstruct the enclosed basement area for use as parking. (Leathers Dep., Ex. 24 at 21, Doc. 42–3 at 47.)

At the December 15, 2009, City Council hearing, Councilmember Fries raised a concern regarding the value of the property if the parking garage were enclosed and expressed worry about "the City being left with a building that doesn't function typically." (Tr. Dec. 15, 2009, City Council Hearing at 49:17–50:8.) In response the City Attorney stated that if the property were sold and the new property owner no longer wanted to use it as a church, it was his opinion the City would have a difficult time backtracking from the approval of the modification of the building to allow conversion of the parking garage into usable space. (*Id.* at 50:13–51:4.) Councilmember Fries concluded the discussion, followed by a motion to reject the alternate conditions, by stating "I think it's putting undue pressure on the City to enforce things. Even with the idea of . . . putting the parking lot back when they're ready to sell it. Who's going to push that point to get it really done? I don't know that I'm comfortable with the City being in this regulation of all aspects of this." [41] (*Id.* at 51:9–17.) A reasonable factfinder could view this course of proceedings in factually opposing ways. It could conclude that the City had legitimate non-discriminatory land use and policy reasons for its determination, or alternatively, conclude that the City refused to consider the availability of less discriminatory alternatives proposed by Plaintiff. If the factfinder concluded the latter, it might construe this evidence

---

41. City Councilmembers expressed similar concerns over enforcing a limitation on maximum occupancy of the building and therefore rejected that alternate condition that had been recommended for approval by the Planning Commission. (Tr. Dec. 15, 2009, City Council Hearing at 54:14–55:8.) The Court observes that these proposed membership limitations might also have entailed the Sandy Spring government's excessive entanglement with control of the Scientology Church's activities, in violation of the First Amendment. *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

in conjunction with other evidence of differences in treatment in the zoning process so as to discern a discriminatory purpose behind the City's conditional approval. *See Jean v. Nelson,* 711 F.2d at 1486 (*citing United States v. Board of Commissioners of Indianapolis,* 573 F.2d 400, 413 (7th Cir.1978), *cert. denied,* 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978) (holding that a plaintiff can make out a prima facie case of discrimination by establishing that the government ignored less discriminatory options which would have furthered its policies as effectively as the more discriminatory option it chose)).

Finally, Plaintiff asserts for the first time on reconsideration that statements of certain council members give rise to an inference of discrimination on the part of the City. Plaintiff cites to a portion of the December 15, 2009, City Council hearing wherein Councilmember Paul and Plaintiff's counsel apparently began arguing over what the practice of Scientology and Plaintiff's use of the property for the practice of Scientology would entail. (Tr. Dec. 15, 2009, City Council Hearing at 39–47.) Although Councilmember Paul did not

make an overtly discriminatory comment regarding the Church of Scientology such as "I don't want Scientologists in Sandy Springs," he did appear to engage in a heated debate with Plaintiff's counsel in which the Mayor interjected and asked Councilmember Paul to limit his questions to "what's allowable." (*Id.* at 43:8–17.)

An unconstitutional motive on the part of one member of the City Council is insufficient to impute an unconstitutional motive to the entire City Council as a whole. *See Matthews v. Columbia County,* 294 F.3d 1294, 1297 (11th Cir.2002) (in discussing context of § 1983 claim for retaliatory termination by county as a result of plaintiff's exercise of her free speech); *see also Mason v. Village of El Portal,* 240 F.3d 1337, 1339 (11th Cir.2001) (holding that evidence that majority of members of council shared improper motive is required to establish liability on the part of the municipality). Thus, standing alone, Councilmember Paul's statements are insufficient to show that the City Council acted with the intent to discriminate.[42] While Councilmember Paul's dialogue with Plaintiff's counsel is not direct evidence of

---

42. Plaintiff also asserts that "Councilmember Tibby DeJulio summed up the City's attitude toward the Church [by stating]: 'It's a nontraditional church and we should have nontraditional rules to go along with non-traditional churches.'" However, the Court notes that Plaintiff has taken the statement entirely out of context in order to manufacture a discriminatory motive on the part of Councilmember Tibby DeJulio and attribute such a motive to the entire City Council. After expressing his concerns about the lack of parking on site, Councilmember DeJulio followed up on Councilmember Paul's questions about extra security on the property in light of Plaintiff's counsel's statement that even though the Church museum, café, and bookstore are open to the public, "You have to pass through security in order to get in," and the Church of Scientology is "very strict about [its] security because of groups in the United States that oppose the Church of

Scientology and have done some pretty awful things. They've gone in and destroyed areas. They've made threats. They've made anthrax threats, for example." (Tr. Dec. 15, 2009, City Council Hearing at 44.) In response, Councilmember DeJulio stated "And, Woody ... [y]ou're telling me we have to have security in the church because people want to come in. And I can't walk in that church because I don't have a security card for that church, and yet ... it's a nontraditional church and we should have nontraditional rules to go along with nontraditional churches. This just doesn't make sense to me." (*Id.* at 56.) Thus, it is clear to the Court that the tenor of this comment was not an expression of the Council's view of the Church of Scientology, but instead was one Council member's response to Plaintiff's request to have the City apply nontraditional rules to its admittedly nontraditional church.

a discriminatory intent and may not be attributed to the City as a whole, these contemporaneous statements of one of the decision-makers made on the record during the City Council's hearing may be relevant to the factfinder's evaluation of the sequence of events and whether the evidence as a whole reflected a course of discriminatory conduct on the part of the City. *Reaching Hearts Int'l*, 584 F.Supp.2d at 782–83; *see generally Arlington Heights*, 429 U.S. at 268, 97 S.Ct. 555.

 In light of the totality of the circumstances, there is sufficient evidence in the record to create a triable issue of fact on whether the City acted with a discriminatory purpose in its conditional approval of Plaintiff's Application by limiting the square footage of the Church based on an inadequate parking allocation and thereby allegedly rendering the building unfit for the practice of Scientology. *See Wright*, 187 F.3d 1287; *see also Hall v. Holder*, 117 F.3d 1222, 1225–26 (11th Cir.1997) (finding that intentional discrimination can be inferred from the circumstances surrounding the challenged government action where the facts are sufficiently compelling). Accordingly, as material questions of fact still exist regarding whether Plaintiff has established a prima facie case of discrimination under Section (b) of RLUIPA, the parties' motions for summary judgment on Plaintiff's nondiscrimination claim (Count II) are denied, and the Court need not reach the question of whether the City can justify its action by articulating a compelling government interest at this juncture.[43]

**43.** For these reasons, Plaintiff's claims in Count IX (equal protection) survive summary judgment. Likewise, following the Eleventh Circuit's treatment of § (b)(1) of RLUIPA as being coexistent with the religious protections afforded by the First and Fourteenth Amendments in *Midrash*, Plaintiff's claim in Count VI (establishment clause) also survives summary judgment. *See Midrash*, 366 F.3d at 1238–39. The establishment clause prohibits the government from favoring one religion over another without a legitimate secular reason. *Id.* (citing *Gillette v. U.S.*, 401 U.S. 437, 450, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971)). Although the Court's focus on a claim for violation of the establishment clause is not directed toward the intent of the City, but on whether a reasonable, objective observer would conclude that the City's action amounted to religious infringement as opposed to some other secular purpose, the Eleventh Circuit has held § (b) of RLUIPA codifies existing establishment clause rights against states and municipalities that disparately treat religious assemblies or institutions and favor one religion over another. *Id.; see also Vision Church v. Village of Long Grove*, 468 F.3d at 991–996 (setting forth the standard for an establishment claim in the context of a case under RLUIPA). "The primary question is whether, irrespective of the government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval." *Id.* at 992. Although the Director testified "[t]he issue for us is not whether it is a religious use but whether the parking is appropriately calculated," (Leathers Dep. 205:1–3), a reasonable, objective observer could conclude that the City's application of the Parking Ordinance to Plaintiff had the primary effect of inhibiting the expansion of the Scientology church, while favoring the expansion of other churches. On the other hand, the City Staff indicated that "the entire 43,246 square feet" proposed by Plaintiff could be recommended for approval if Plaintiff sought a variance from the minimum parking requirements or could demonstrate that the on-site parking will be sufficient to meet the full use of the building through either a parking study or a shared parking analysis. (Leathers Dep., Ex. 20 at 13; Leathers Dep., Ex. 21 at 12.) In addition, the City deferred action on Plaintiff's rezoning application for nine months, allowing Plaintiff to present the Parking Studies and the Alternate Conditions to its Application in order to alleviate any hardship resulting from the minimum parking requirement imposed by the Ordinance. Thus, a reasonable, objective observer could conclude that the City's zoning decision was not based on its disapproval of Plaintiff's proposed religious use of the property, but instead was based on an application of the Parking Ordinance in a way that characterized the different types of uses proposed

*See Midrash,* 366 F.3d at 1228; *Covenant Christian Ministries,* 2008 WL 3903432, at *10.

### c. RLUIPA's Exclusions and Limits Provision

 RLUIPA's exclusions and limits provision prohibits a land use regulation that "unreasonably limits religious assemblies, institutions, or structures *within a jurisdiction.*" 42 U.S.C. § 2000cc(b)(3) (emphasis added). It is clear from the plain language of the statute that the purpose of this provision is not to examine the restrictions placed on individual landowners, but to prevent municipalities from broadly limiting where religious entities can locate. *West Pikeland,* at 387; *see also Rocky Mountain Christian Church v. Board of County Commissioners,* 613 F.3d 1229, 1238 (10th cir.2010) (noting that district court's jury instruction properly required the plaintiff to establish that the county's "regulation, as applied or implemented, has the effect of depriving both [RMCC] and other religious institutions and assemblies of reasonable opportunities to practice their religion, including the use and construction of structures, within Boulder County."); *see also Vision Church v. Village of Long Grove,* 468 F.3d at 990; *Chabad of Nova, Inc. v. City of Cooper City,* 575 F.Supp.2d 1280, 1289 (S.D.Fla. 2008). In fact, Plaintiff acknowledges that a church is a permitted use in the City. Plaintiff asserts only that "[b]y refusing to allow the Church to use its building as requested, the City has limited the ability of the Church to practice its religion in

accordance with the doctrine of Scientology." (Pl.'s Br. Summ. J. at 30.) Plaintiff has not demonstrated any conduct by the City that had the effect of depriving or limiting religious assemblies, institutions, or structures within Sandy Springs. *Id.* Therefore, the City is entitled to summary judgment on Count III of Plaintiff's Complaint.

### B. Freedom of Speech

 The City seeks summary judgment with respect to Plaintiff's freedom of speech claim in Count VII. Plaintiff argues that its freedom of speech was violated because the City's refusal to approve the entire 43,916 square feet of Plaintiff's building prohibits Plaintiff from practicing its religion in accordance with its Scriptures. Plaintiff cited no authority in support of its claim. Defendants contend that the property was approved for use as a church and nothing prohibits Plaintiff from speaking or assembling on the property for religious purposes.[44]

Plaintiff's free speech claim is identical to its constitutional free exercise claim which the Court found was encompassed in its RLUIPA claim. Having found that genuine issues of material fact exist with regard to whether the City has substantially burdened Plaintiff's religious exercise by effectively barring its use of the property for its particular form of religious expression and assembly, the Court denies Defendants' Motion for Summary Judgment with respect to Count VII.

---

by Plaintiff as required under the language of the Ordinance itself. Accordingly, because the factfinder could reach different conclusions based on these facts, summary judgment is denied as to Count VI of Plaintiff's Complaint.

**44.** The Court notes the persuasiveness of this argument. However, RLUIPA's substantial

burden provision is construed here as being congruent with the First Amendment protections under *Midrash,* etc. Construing the evidence in the light most favorable to the Plaintiff, the Court finds therefore that the factfinder could find that the City's action effectively bars *Plaintiff's use of the property in accordance with the tenants of Scientology.*

## C. Federal Takings and State Inverse Condemnation Claims

■ Plaintiff concedes that its Fifth Amendment takings claim and inverse condemnation claims are not ripe for adjudication until the state court considers them in a pending related action filed by Plaintiff in the Superior Court of Fulton County. However, Plaintiff asks the Court to deny Defendants' Motion for Summary Judgment and retain jurisdiction until such time as Plaintiff has exhausted its remedies in state court. Plaintiff cites no authority for such a request. Moreover, the state court action was stayed on January 22, 2010, pending this Court's resolution of Plaintiff's federal claims.

■ Under the Supreme Court's decision in *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City,* 473 U.S. 172, 195, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), a federal constitutional takings claim is not ripe until the plaintiff has unsuccessfully pursued a compensation claim in state court. Therefore, Plaintiff's takings claim does not present a case or controversy ripe for judicial review and this Court lacks subject matter jurisdiction over that claim. *Tari v. Collier County,* 56 F.3d 1533, 1535–36 (11th Cir.1995) ("The question of ripeness goes to whether the district court had subject matter jurisdiction.") (citations omitted). Accordingly, the City is entitled to summary judgment on Plaintiff's takings and inverse condemnation claims (Counts X & XII).

## D. Violation of Substantive Due Process Under Georgia Constitution

The City seeks summary judgment with respect to Count XI of Plaintiff's Complaint construed as alleging violations of its substantive due process rights under the Georgia Constitution. The City's rezoning decision enjoys an initial presumption of validity, and this presumption may be overcome only by clear and convincing evidence from Plaintiff showing that the decision is significantly detrimental to it and insubstantially related to governing public interests. *Dekalb County v. Flynn,* 243 Ga. 679, 256 S.E.2d 362, 363–64 (1979); *Westbrook v. Board of Adjustment,* 245 Ga. 15, 262 S.E.2d 785, 787 (1980). Once Plaintiff has carried its initial burden, the burden then shifts to the City to justify its decision. *Id.*

■ A property owner's substantive due process rights are not violated by the application of a zoning ordinance unless it is "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals or general welfare." *King v. City of Bainbridge,* 276 Ga. 484, 577 S.E.2d 772, 775 (2003) (citing *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 395, 47 S.Ct. 114, 71 L.Ed. 303 (1926)); *Northside Corp. v. City of Atlanta,* 275 Ga.App. 30, 619 S.E.2d 691, 692 (2005) (citing *Jackson v. Spalding,* 265 Ga. 792, 462 S.E.2d 361 (1995)) ("The standard of review in such a case is whether the board's decision was arbitrary or capricious."). *See also Greenbriar, Ltd. v. City of Alabaster,* 881 F.2d 1570, 1578 n. 15 (11th Cir.1989), *reh'g denied, en banc,* 893 F.2d 346 (1989) (applying standard where plaintiffs argued that a zoning regulation deprived them of substantive due process). Even if the validity of the land classification is "fairly debatable," the legislative judgment must control. *Village of Euclid,* 272 U.S. at 388, 47 S.Ct. 114. The Eleventh Circuit has held that the "ultimate issue of whether a zoning decision is arbitrary and capricious is a question of law to be determined by the court." *Greenbriar,* 881 F.2d at 1578.

■ In response to the City's motion, Plaintiff equates its substantive due process claim with a takings claim, arguing that Plaintiff has been deprived of the full

use of its property without just compensation in violation of substantive due process under Georgia law.[45] (Pl.'s Resp. Summ. J. at 24–25.) Plaintiff does not assert that the City's action denies it the economic value of its property. Instead, Plaintiff argues that the City's action denies it the ability to use its property for its desired purpose. As stated above in Section III(A)(1)(b) *supra*, the City's conditional approval did not deprive Plaintiff of its use of the property as a church. Indeed, the City's action allows use of 32,053 square feet (i.e., the substantial majority) of the building for religious purposes. In addition, the City also noted that use of the entire 43,000 square feet could be approved if Plaintiff could demonstrate the need for a variance or a reduction in required on-site parking through a shared parking arrangement. As noted earlier, Plaintiff's failure to pursue these remedies

may have arguably contributed to or caused Plaintiff's inability to satisfy the minimum on-site parking and thereby obtain approval of its proposed conversion of the basement for religious use. While these facts may give rise to a valid RLUIPA claim under section (a)'s substantial burden provision, they do not similarly support a substantive due process claim.

The City's conditional approval of Plaintiff's rezoning Application is presumptively valid unless Plaintiff demonstrates through clear and convincing evidence that the City's action was arbitrary and capricious. *Dekalb County v. Flynn*, 256 S.E.2d at 363–64; *Westbrook*, 262 S.E.2d at 787; *Village of Euclid*, 272 U.S. at 388, 47 S.Ct. 114 (observing that even if the validity of the land classification is "fairly debatable," the legislative judgment must control). Plaintiff has failed to show that the City's application of the multi-use parking stan-

---

**45.** Although the Eleventh Circuit in *Eide v. Sarasota County*, 908 F.2d 716, 721–22 (11th Cir.1990), distinguished a substantive due process claim (referred to as an "arbitrary and capricious due process claim") from a due process takings claim, it appears that both the United States Supreme Court and the Georgia courts recognize that a substantive due process claim can arise out of a regulatory taking. *See Williamson County*, 473 U.S. at 199–200, 105 S.Ct. 3108 (discussing but declining to decide the issue); *Tuggle v. Manning*, 224 Ga. 29, 159 S.E.2d 703, 706–07 (1968) ("Zoning laws and regulations must meet the demands of the constitutional prohibition against the taking of private property for public use without just compensation, and restrictions which are arbitrary or unreasonable or lacking in any substantial relation to the public health, safety, morals, or general welfare come within the constitutional inhibition, as where a regulation permanently so restricts the use of property that it cannot be used for any reasonable purpose."); *Barrett v. Hamby*, 235 Ga. 262, 219 S.E.2d 399, 401–02 (1975) (finding that zoning is a subject to the constitutional prohibition against taking private property without just compensation where "[a]s the individual's right to the unfettered use of his property confronts the police

power under which zoning is done, the balance the law strikes is that a zoning classification may only be justified if it bears a substantial relation to the public health, safety, morality or general welfare. Lacking such justification, the zoning may be set aside as arbitrary or unreasonable."). In *Eide*, the Court stated that to prove a due process takings claim, "a landowner must establish that the regulation goes too far, destroying the value of the property to such an extent that it has the same effect as a taking by eminent domain. To prove an arbitrary and capricious due process claim, a plaintiff need only prove that the government has acted arbitrarily and capriciously.... Such a claim does not have to establish that the regulation has gone too far; rather, a property owner's rights have been violated the moment the government acts in an arbitrary manner and (in an as applied challenge) that arbitrary action is applied to the owner's property." *Id.* at 722, 724 n. 13. Here, Plaintiff asserts, that the alleged arbitrary and capricious action was the application of the Parking Ordinance, denying Plaintiff of the full use of its property, as courts have recognized such an application may give rise to a potential substantive due process claim, albeit sounding in takings.

dard was arbitrary and capricious. As stated above in Section III(2)(b)(i), the City's interpretation and application of the Parking Ordinance was a reasonable exercise of its zoning authority. *See Midrash,* 366 F.3d at 1234. Under the facts presented, even construed in the light most favorable to Plaintiff, there is simply no ground to conclude that Plaintiff's substantive due process rights were violated.

Accordingly, the Court finds that Plaintiff has not carried its burden of establishing a prima facie substantive due process claim.[46] Defendants are therefore entitled to summary judgment on this claim.

### E. Mandamus

■ Plaintiff's Complaint also includes a claim for mandamus requesting that the Court order the City to apply the "church parking standard" to Plaintiff's property (Count XIII). Federal district courts do not have the authority to issue writs of mandamus to direct state officials in the performance of their duties. *See* 28 U.S.C. § 1361; *Moye v. Clerk, DeKalb Superior Court,* 474 F.2d 1275, 1276 (5th Cir.1973)[47]

; *Noe v. Metropolitan Atlanta Rapid Transit Authority,* 485 F.Supp. 501, 504 (N.D.Ga.1980), *aff'd* 644 F.2d 434 (5th Cir. 1981). Accordingly, because this Court lacks jurisdiction over such a claim, Defendants' Motion for Summary Judgment as to Count XIII is granted.

## V. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Reconsideration, [Doc. 89], is **GRANTED** and Plaintiff's Motion for Summary Judgement, [Doc. 37], is **DENIED.**

Defendant's Motion for Summary Judgment with respect to Count II (equal terms and exclusions and limitations claims), Counts III, and Counts XI–XIII is **GRANTED.** Because triable issues of fact remain as to Counts I, II (nondiscrimination claim), IV, and Counts V–IX, Defendants' Motion for Summary Judgment as to these counts is **DENIED.**[48]

As neither party demanded a jury trial, this case will be tried to the Court at a bench trial. The Court notes that based

---

**46.** The Court also notes that the City's stated reasons for its conditional approval of Plaintiff's Application due to a lack of sufficient on-site parking has been recognized as having a substantial relation to public health, safety or general welfare. *See Midrash,* 366 F.3d at 1234 n. 17 (noting that zoning ordinances related to size and parking are reasonable "run of the mill" regulations); *Vineyard Christian Fellowship of Evanston, Inc. v. City of Evanston,* 250 F.Supp.2d 961, 978 (N.D.Ill. 2003) (referring to traffic and parking problems as "important").

**47.** Decisions of the former Fifth Circuit filed prior to October 1, 1981, constitute binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981).

**48.** As an additional matter, Defendants' Motion to Strike, [Doc. 61], portions of the Deposition of Nancy Leathers and portions of the Affidavit of Deborah Danos is **DENIED.** The

courts in this district have repeatedly found that it is improper to strike an affidavit attached to a summary judgment brief. *See Jordan v. Cobb County, Georgia,* 227 F.Supp.2d 1322, 1346 (N.D.Ga.2001); *Lentz v. Hospitality Staffing Solutions, LLC,* No. 1:06–cv–1893–WSD, 2008 WL 269607, at *10 (N.D.Ga. Jan. 28, 2008) (noting that Federal Rule of Civil Procedure 12(f) permits the court to strike a pleading, not an affidavit attached to a motion for summary judgment). As the Court in *Lentz* stated, "the proper method to challenge such an affidavit is to challenge the admissibility of the evidence contained in the affidavit." *Id.; see also Pinkerton & Laws Co. v. Roadway Express, Inc.,* 650 F.Supp. 1138, 1141 (N.D.Ga.1986). The Court considered the objections raised by Defendants in its analysis of the motions for summary judgment and finds no ground to strike the deposition testimony or affidavit from the record where the evidence was not dispositive of the Court's ultimate determination of the issues presented.

on the evidence presented at this juncture, this case can be viewed in diametrically opposing ways. On one hand, the case appears to involve the application of "run of the mill" zoning regulations, with slight procedural differences, by a newly created City that Plaintiff disproportionately magnifies to support its claims. On the other hand, it also appears that the City may have ultimately used its regulatory authority in a discriminatory manner without consideration of appropriate parking alternatives that would be less burdensome on Plaintiff's religious exercise on the subject property.

The resolution of the issues remaining for trial will certainly prove difficult as a result of the context in which this case arose. This case does not involve a simple rezoning. Rather, the record reflects that the City was dealing with a proposal from the Church for an expansion of usable space but a reduction in required parking combined with the announced potential for an exponential increase in membership of the Church's congregation. The proof threshold for Plaintiff's showing of substantial burden is high and generally difficult to meet. The disparities in the City's treatment of Plaintiff's Application as compared to other churches in Sandy Springs may turn out to be fully explainable and carry no legal significance. The Court has refrained from granting summary judgment based on existing evidence of these differences and substantive disputes as to the meaning that should be gleaned from these differences. However, the evidence at trial, previewed quite fully in the summary judgment materials, appears as if it may well fall short of establishing the existence of a substantial burden on Plaintiff's religious exercise or a discriminatory intent on the part of the City.

Moreover, even if Plaintiff meets its burden of establishing a prima facie case under RLUIPA that it has suffered a substantial burden and/or discrimination, the Court may nevertheless find that the City's grant of a conditional approval was justified in light of the Court's finding herein that the City's refusal to calculate parking based on the Ordinance's "church use" parking standard was reasonable because the Plaintiff's assembly area did not provide an adequate indicia of usage. Indeed, the City's determination that the Plaintiff's parking could not be determined based solely on the square footage of its sanctuary was based on Plaintiff's own representations to the City during the zoning process that large religious assemblies were a minimal use of the property. Now Plaintiff attempts to argue that all religious practices of Scientology, including Training and Auditing, are assembly type uses in direct contradiction to what it represented to the City at the time the City made its determination. While the arbitrary application of laws to a religious organization may reflect bias or discrimination, land use conditions do not constitute a substantial burden under RLUIPA where they are neutral and traceable to municipal land planning goals and where there is no evidence that the government action was based on the religious nature of the land use. That said, the Plaintiff presents viable claims for trial as "Congress sought, through RLUIPA, to protect religious land uses from discriminatory processes used to exclude or otherwise limit the location of churches and synagogues in municipalities across the country," and Plaintiff's evidence is sufficient to pass the hurdle of summary judgment. *Midrash*, 366 F.3d at 1236.

A trial of this case will entail substantial costs. The reality is that the parties may in a reasonably expedited time frame be able to develop a far more satisfactory resolution of this matter than will result if they must await for months on end for a bench trial and ruling, and most likely after that, a gamut of further proceedings.

Given the important interests at stake, the parties are **DIRECTED** to engage in mediation of this matter. The parties may mutually agree upon a private mediator or if unable to reach an agreement, the Court will appoint a private mediator from a list of three mediators to be provided to the parties. The parties should notify the Court no later than February 22, 2012, if they are unable to agree upon a mediator. A duly authorized representative of the Plaintiff shall attend the mediation, and at least one representative of the Sandy Springs City Council shall also attend. The parties are **DIRECTED** to explore whether a shared parking arrangement, both on-site and off-site, based on the actual projected growth of the Church's staff and membership, can be agreed upon to allow Plaintiff's requested expansion and modification of the basement area for church use. The mediation in this matter must be completed by April 2, 2012, absent the Court's approval of an extension.

The parties are **DIRECTED** to file their Consolidated Pretrial Order no later than March 16, 2012.